**LEIGH FURNITURE AND CARPET COMPANY, Plaintiff, Appellant, and Cross-Respondent,**

v.

**T. Richard ISOM dba Richard's Fine Furnishings, Defendant, Respondent, and Cross-Appellant.**

No. 17264.

Supreme Court of Utah.

Dec. 10, 1982.

Gary R. Howe, W. Clark Burt, Salt Lake City, for Leigh Furniture and Carpet Co.

Arthur H. Nielsen, Clark R. Nielsen, Salt Lake City, for Isom.

OAKS, Justice:

In 1970, Leigh Furniture and Carpet Co., a corporation, sold a furniture business in St. George to T. Richard Isom on a contract specifying a $20,000 down payment for immediate possession, with the balance of $60,000 at $500 per month plus interest for ten years.

In 1975, when the contract balance was $27,000, Leigh Furniture (hereafter "the Leigh Corporation") brought this action against Isom to repossess the business, terminate his interest under the contract, and obtain a deficiency judgment for any sums due after liquidation. Isom denied that he was in default under the agreement, alleged his tender and the Leigh Corporation's refusal to accept the sum due under the contract, and counterclaimed for $100,000 damages caused when the Corporation intentionally and maliciously forced him out of business and into bankruptcy. Isom also sought punitive damages.

The jury found for Isom in all respects, including compensatory damages of $65,000 and punitive damages of $35,000 on his counterclaim. The district court denied the Leigh Corporation's motion for judgment notwithstanding the verdict, which challenged the legal and evidentiary basis for the verdict on the counterclaim. However, the court reduced the punitive damages to $13,000, and, upon Isom's accepting that remittitur, also denied the Corporation's motion for a new trial on the amount of punitive damages. Judgment was thereupon entered on the verdict against the Leigh Corporation (reduced as to punitive damages). The Corporation took this appeal, and Isom cross-appealed, challenging the reduction of punitive damages.

The issues on this appeal are exclusively concerned with Isom's recovery on the counterclaim. They are: (1) whether Utah has a cause of action for intentional interference with prospective economic relations; and, if so, (2) whether that tort was proved on the facts of this case; and (3) whether the punitive damages should have been reduced.

## I. THE FACTS

With all conflicts resolved in favor of the prevailing party and all evidence viewed and inferences drawn in the light most supportive of the verdict of the jury, *Cintron v.*

*Milkovich,* Utah, 611 P.2d 730, 732 (1980); *Ute-Cal Land Development Corp. v. Sather,* Utah, 605 P.2d 1240, 1245 (1980); *Lamkin v. Lynch,* Utah, 600 P.2d 530, 531 (1979), the facts were as follows.

Leigh Furniture, a closely held family corporation, operated a main store in Cedar City and branch stores in Kanab and St. George. The principal owner and chief executive officer was W.S. "Dub" Leigh (hereafter "Leigh"). In 1969, Leigh decided to sell the St. George store. He contacted T. Richard Isom ("Isom"), a Utah native then living in Washington State but desirous of returning to Utah, as a possible buyer. Discussions ensued, and Isom moved to St. George and began working as an employee in the Leigh store. On May 14, 1970, Isom signed the contract to buy the St. George store from the Leigh Corporation. Isom agreed to maintain the inventory, together with cash and accounts receivable, at a level of at least $60,000, and to provide the Leigh Corporation with an inventory each quarter and a financial statement each month.

In the same document, the Leigh Corporation leased Isom the parking lot and the first floor of the building containing the store, but expressly retained the second floor of the building, which consisted of 17 apartments the Corporation had leased to others. As monthly rental, Isom agreed to pay 3% of his gross sales for the previous month, with a minimum of $500 per month the first year and $600 per month thereafter. The lease term was ten years, with an option to renew for an additional ten years.

The contract also granted Isom an option to purchase the entire building, including the upstairs apartments, exercisable once he had paid the $60,000 balance on his contract. The option price was to be determined at the time of exercise by a committee of three appraisers, one to be appointed by each party and a third to be chosen by the other two.

Finally, the contract provided that if Isom defaulted in payment or performance of any term and the default remained uncured for 60 days, the Leigh Corporation could cancel the agreement, repossess the merchandise and real property, and retain all payments and rents as liquidated damages.

For one year, relations between the contracting parties were peaceful, but in June and July of 1971, Leigh began to complain about the contract and to state that he wanted to sell the entire building but prospective buyers would not purchase it subject to Isom's long-term lease and option to buy.[1] In a letter to Isom, Leigh complained that Isom was in default on his payments and was allowing his inventory to drop below $60,000. (Isom was behind in his payments at that time but was within the 60-day grace period in the contract and therefore was not in default.) At that same time, Leigh visited Isom in the store, verbally attacking him while he was with a customer and causing the customer to leave the store.

Beginning in July, 1971, Leigh, his wife, and the Corporation's bookkeeper, acting as the Leigh Corporation's agents, began a continuous pattern of visiting Isom at least once a week while he was working in his store, questioning him concerning his operation of the business, and making demands and accusations. In addition to the visits, Leigh wrote defendant letters criticizing various aspects of the business. In one week in the summer of 1971, Isom received four letters from Leigh, his wife, and his bookkeeper complaining about the furnace, the heat, and the delay in receiving the monthly financial statements. All of this conduct on Leigh's part had the cumulative effect of demoralizing and upsetting Isom and his employees, reducing their productivity, and impairing their ability to deal with the public and to conduct their business.

---

1. The court instructed the jury "that it has been established that W.S. Leigh was at all times acting as the agent for plaintiff, Leigh Furniture and Carpet Company, and within the scope of his authority at the time of the events out of which this action arose." That ruling, to which there was no objection, makes the Leigh Corporation fully responsible for all of Leigh's actions in this matter.

At the same time, despite the existing contract with Isom, Leigh attempted to sell the building to two of Isom's employees.

In December, 1971, the Leigh Corporation's attorney again informed Isom that Leigh was dissatisfied with the contract and Isom's performance under it, and demanded an audit of the store's inventory and books. Although no provision of the contract entitled the Leigh Corporation to audit Isom's business and Leigh's demand came during Isom's busy Christmas season, Isom agreed on condition that the audit be taken after the new year and that it be confidential. The audit was performed by a certified public accountant employed by the Corporation in its Cedar City store. Following the audit, the accountant called Isom's father, an attorney who represented Isom, to inform him that a change in Isom's business was needed and to recommend that Isom bring in a business associate who had expertise in furniture retailing and who could contribute some additional working capital to the business.

The Corporation's weekly visits continued through the summer of 1972. In the spring of 1972, the Leigh Corporation's bookkeeper, on one of his visits to Isom's store, insisted that Isom date all his accounts receivable. Isom refused. Later that same summer, while visiting the store, Leigh accused Isom of subletting the parking lot in violation of the lease agreement and threatened to terminate Isom's business and repossess the store. Isom had permitted a friend to fence a portion of the vacant lot on the property he leased from the Corporation to temporarily store some merchandise for a plumbing business. In response to Leigh's threats, Isom had his friend remove his merchandise and the fence.

In June or July, 1972, Leigh again met with Isom's attorney (his father) to complain about Isom's performance under the contract. Leigh said he felt Isom maintained an inadequate inventory to act as security, and to alleviate his feelings of financial insecurity he wanted to sell the building to someone else. He also suggested that Isom bring in an associate with additional capital and more experience in furniture retailing. Specifically, Leigh suggested Brent Talbot, who had available capital and twenty years' experience in furniture retailing. Leigh indicated that if Talbot came in as a business partner "everything would be all right."

In response to this discussion, Isom's attorney began to pursue partnership discussions with a Mr. Hayes Hunter, who owned and operated a furniture store in Cedar City. On one of two trips that he and Hunter made to inspect Isom's business, they were observed together in Isom's store by the Leigh Corporation's bookkeeper. A few days later, Isom's attorney received a phone call from Leigh, who angrily told him that if he had any ideas about bringing Hayes Hunter into the business, he "could forget it" because Leigh wouldn't have Hunter in the store. Thereafter, at Hunter's request, neither Isom nor his attorney pursued any further negotiations with Hunter regarding a possible partnership.

Approximately a month later, in August, 1972, Leigh again told Isom's attorney that Isom needed to have Talbot as a partner and encouraged him to pursue negotiations toward that end. Leigh again complained about the long-term lease he had given Isom and stated that he "should kick [Isom] out" and sell the building.

Shortly after this discussion, Leigh's attorney sent Isom's attorney a complaint Leigh intended to file in court to terminate the sale agreement and dispossess Isom. Oral and written negotiations ensued, during which Isom attempted to arrive at some settlement of Leigh's complaints and resolve all the disputes embodied in the threatened lawsuit.

On September 28, 1972, the parties signed a supplemental agreement, drafted by Leigh's attorney, which incorporated and supplemented the original contract. Among other things, it required Isom (1) to advance $20,000 toward the unpaid balance of the purchase price (a condition demanded by Leigh), half upon execution of the supplemental agreement and half on or before January 15, 1973; and (2) to obtain Leigh's

prior written approval of any person to whom Isom intended to convey any ownership interest in the business whether as partner, investor, or corporation shareholder.[2] Isom paid the $20,000 in accordance with the supplemental agreement, which reduced the unpaid balance on the purchase price to $27,000 in January, 1973, and prepaid the monthly installments under the contract through December, 1975.

The supplemental agreement was intended to resolve all the disputes between Leigh and Isom. However, even after its execution, Leigh continued to pursue previously initiated lawsuits against Isom, causing Isom to incur the expense and effort of defending two groundless actions. In the first, Leigh sued Isom and a former employee, Francis Leany, for $4,000—the value of furniture Leany had purchased from the Leigh Corporation while employed in its St. George store. After trial in December, 1972, the court found that the Corporation and Leany had offset their accounts long before Isom acquired the business and ruled that the Corporation had no right to the disputed $4,000. The suit was dismissed on January 26, 1973.

In the second action, a plumbing company sued the Leigh Corporation and Isom to recover $2,000 worth of repair work it had performed on the furnace in the leased building. In accordance with the contract, Isom had paid the first $500 toward the cost of repair. Although the contract made the Corporation, as lessor, responsible for all costs in excess of $500, it refused to pay the balance of the repair bill, asserting instead that Isom was liable. After another trial, the court sustained Isom's position and required the Leigh Corporation to pay the balance of the repair bill.

After the $20,000 prepayment and the execution of the supplemental agreement, Leigh continued to visit defendant to check on his operation of the business, but his visits, either in person or through his wife and employees, became less frequent and less demanding. Other than Isom's required defense of the two groundless suits, the period between October, 1972, and April, 1974, was relatively calm. Isom was able to devote himself to operating his business, and the $27,000 net loss for the calendar year 1970 was turned into a $17,000 net profit for the calendar year 1973. Isom's store continued to make a profit into the first part of 1974, accruing a net profit of $5,000 through August, 1974.

In April, 1974, following the conclusion of the lawsuit by the plumbing company, Leigh renewed his questions and pressures on Isom. Leigh continually complained to Isom about the store's inventory, the air conditioner, the length of time it took Isom's accountant to prepare the monthly financial statements, and the format of the financial statements. Leigh refused to pay for a store window broken by customers of the adjacent bicycle shop, even though the contract gave the Corporation "the obligation of all exterior maintenance and repairs to the building." The heating bills began to accumulate because the Leigh Corporation refused to pay its share in violation of the contract provision that required it "to pay 60% of the cost of space heating, payable each month heat is furnished the apartments." To resolve the matter, Isom was required to make trips to Cedar City.

Leigh and other representatives of the Corporation continued to visit Isom while he was at work in the store, demanding that he produce various documents and records and reiterating demands that he date his accounts receivable. Leigh renewed his threats to cancel the contract. Isom was required to spend a substantial amount of his time attending to these visits and responding to the demands. During this same time, sales began to decline, and the store became unproductive.

In the summer of 1974, Isom's attorney followed Leigh's prior suggestions by ap-

---

**2.** Contemporaneous with the execution of the supplemental agreement, Leigh gave his written approval of two individuals whom Isom requested as prospective partners in the business. For reasons unrelated to this lawsuit, neither of these men ever acquired any interest in the business with Isom.

proaching Brent Talbot about joining Isom's business. He wrote Leigh and his attorney requesting Leigh's approval, but Leigh did not respond. Isom's attorney again wrote to Leigh, outlining the advantages of bringing Talbot into the business. Isom and Talbot eventually reached a tentative partnership agreement, but Leigh refused to approve Talbot unless Isom agreed to terminate his contract and his ten-year lease, "drop out" of the store completely, and turn it back to Leigh. These terms being unacceptable to Isom, the negotiations with Talbot were discontinued. Thereafter, Isom's attorney submitted repeated requests to associate a Mr. Applegate in the business, but never received any response from Leigh.

Leigh's continuing threats to evict Isom had a demoralizing effect on Isom and his employees. Isom devoted a considerable amount of time to responding to in-store visits by Leigh, his wife, and his bookkeeper. These visits interrupted sales activities, and provoked complaints from his customers. The business declined, dissipating the $5,000 profit of August, 1974. By December, 1974, the business showed a net loss of $6,500. Isom concluded that he would have to pay off the $27,000 remaining on the purchase price to keep Leigh from active interference in the affairs of the store. To raise the necessary funds, he was required to take additional time away from his business.

On December 29, 1974, Isom's attorney met with Leigh in San Francisco, where he informed Leigh of Isom's plans to pay the balance of the purchase price. Leigh replied that Isom could do whatever he wanted. Isom's attorney again requested Leigh's approval of Talbot as a business partner after full payment of the purchase price and under the long-term lease and purchase option of the contract. Leigh again refused to approve Talbot as a partner. He reiterated his regret at having granted a long-term lease and stated that he had to get the property back. He suggested that Isom liquidate all the store's stock and turn the store back to him. Leigh also refused to appoint an appraiser

as required by the original contract, so that Isom could exercise his option to purchase the property.

Isom's attorney again met with Leigh and Leigh's attorney on February 14, 1975, and told them the $27,000 balance on the purchase price would soon be paid and that Isom planned to exercise his option to buy the property. Leigh stated he would not sell the property to Isom for its $130,000 value (as determined by Isom's appraiser, subject to Isom's leasehold) because he had an offer to sell the property for $200,000 free of Isom's lease and option. Although at the conclusion of the meeting Leigh agreed to appoint an appraiser to permit Isom to exercise the purchase option in accordance with the original contract of sale, he later refused to do so and, in fact, never did.

On February 24, 1975, without notifying Isom of any default, Leigh filed the complaint in this case, seeking to repossess the premises and terminate Isom's interest under the contract. Three days later, unaware that the complaint had been filed, Isom tendered to Leigh the $27,000 balance due. He requested that Leigh give a receipt for the payment, appoint an appraiser to facilitate his exercise of the purchase option, and approve Brent Talbot as his business associate under the existing lease if the purchase of the building were not accomplished.

Isom learned of the lawsuit before he was served with process. Though demoralized, he nevertheless continued to negotiate with Leigh and to operate the business through February, 1975. Leigh never responded to Isom's tender of the remaining $27,000, although he again told Isom's attorney that he would never approve Talbot's association with Isom under the long-term lease, even for the few months required to finance a purchase of the building, nor would he permit a sale of the property for its appraised value of $130,000. When confronted by Isom's attorney and accused of being recalcitrant so that Isom's business would fail and Leigh could reacquire the business and property, Leigh made no denial.

In March, 1975, while talking to a customer in his store, Isom was served with Leigh's complaint. This service of process despite his continuing efforts to negotiate, surprised and upset Isom so much that he dismissed the customer he had been helping. Upon reading the complaint, he noted that it appeared to be the same complaint Leigh had threatened to file in 1972 and that it reopened the disputes which the supplemental agreement and the prepayment of $20,000 had been intended to resolve. Because of the complaint's prayer for an order restraining Isom from doing further business until an audit could be conducted to determine if he was maintaining adequate security for the $27,000 balance, Isom concluded he could do no further business. He therefore closed the store immediately after being served. Within the next week, Isom's suppliers contacted him to request return of their furniture. Isom replied that at that time he was unable to determine whether he would remain in business, but that he could not release any of his inventory until the dispute with Leigh was finally resolved. Isom declared bankruptcy shortly thereafter.

At trial, there was expert testimony that the value of Isom's leasehold was $45,000, and the net value of Isom's furniture retailing business as of March, 1975, was $59,300. Isom testified that he paid the Leigh Corporation a total of $53,000 plus interest on the total $80,000 purchase price, none of which he recouped. He further testified that because of his bankruptcy he was never able to exercise his option to purchase the building. The record further indicates that through bankruptcy proceedings, the Leigh Corporation, as secured party, finally achieved its goal of reacquiring the business, including inventory, accounts receivable, and the leased premises.

## II. INTERFERENCE WITH CONTRACT

■ Leigh Furniture first contends that Isom's recovery cannot be sustained as an interference with contract because the evidence showed no conduct which "intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Restatement (Second) of Torts* § 766 (1979). *See also Bunnell v. Bills,* 13 Utah 2d 83, 90, 368 P.2d 597, 602 (1962); W. Prosser, *Handbook of the Law of Torts* § 129 at 929–30 (4th ed. 1971); *Annot.,* 26 A.L.R.2d 1227 (1952). In this case, the only contract in evidence was the contract between Isom and the Leigh Corporation. It is settled that one party to a contract cannot be liable for the tort of interference with contract for inducing a breach by himself or the other contracting party. *Dryden v. Tri-Valley Growers,* 65 Cal.App.3d 990, 998, 135 Cal.Rptr. 720, 725–26 (1977); *Cuker Industries, Inc. v. William L. Crow Construction Co.,* 6 A.D.2d 415, 178 N.Y.S.2d 777 (1958); *Houser v. City of Redmond,* 91 Wash.2d 36, 39, 586 P.2d 482, 484 (1977); *Kvenild v. Taylor,* Wyo., 594 P.2d 972, 977 (1979). Isom having failed to prove a cause of action for intentional interference with contract, we cannot sustain the verdict on that theory.

■ However, the right of action for interference with a specific contract is but one instance, rather than the total class, of protections against wrongful interference with advantageous economic relations. *Sumwalt Ice Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 414, 80 A. 48, 50 (1911); 1 F. Harper & F. James, *The Law of Torts* § 6.11 (1956); *Restatement (Second) of Torts* § 766 comment c (1979); 45 Am. Jur.2d *Interference* §§ 49–51 (1969). We therefore proceed to consider whether the jury's verdict for Isom can be sustained on the basis of the related tort of interference with prospective economic relations.

■ If so, we can affirm the judgment. Consistent with the well-settled principle that the appellant has the burden of demonstrating that any error has affected his substantial rights, Utah R.Civ.P. 61; *Startin v. Madsen,* 120 Utah 631, 636, 237 P.2d 834, 836 (1951), we follow the authorities that exercise every reasonable presumption in favor of the validity of a general verdict. Specifically, where more than one cause of

action has been submitted to a jury and where one of those causes of action was error-free, supported by substantial evidence, and an appropriate basis for the general verdict, the judgment on that verdict will be affirmed, even though the evidence was insufficient to sustain the verdict on one of the other causes of action submitted. *Berger v. Southern Pacific Co.,* 144 Cal. App.2d 1, 5, 300 P.2d 170, 173 (1956); *Granone v. County of Los Angeles,* 231 Cal. App.2d 629, 42 Cal.Rptr. 34, 51 (1965); *Aaronson v. City of New Haven,* 94 Conn. 690, 110 A. 872 (1920); *In re Van Houten's Will,* 147 Iowa 725, 124 N.W. 886 (1910); *Watson v. Long,* Mo.App., 221 S.W.2d 967, 971 (1949); *Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir.1980) (applying Cal. law); *Adkins v. Ford Motor Co.,* 446 F.2d 1105, 1108 (6th Cir.1971) (applying Tenn. law). *See generally* 5 Am.Jur.2d *Appeal and Error* § 787 (1962).

## III. INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### A. History and Elements of the Tort

■ The tort of intentional interference with prospective economic relations reaches beyond protection of an interest in an existing contract and protects a party's interest in prospective relationships of economic advantage not yet reduced to a formal contract (and perhaps not expected to be). *Buckaloo v. Johnson,* 14 Cal.3d 815, 537 P.2d 865, 868–69, 122 Cal.Rptr. 745, 748–49 (1975); *Restatement, supra,* § 766B comment c; W. Prosser, *supra,* § 130. Although previously faced with arguments or circumstances presenting the issue, *e.g., Searle v. Johnson,* Utah, 646 P.2d 682, 683 (1982); *Soter v. Wasatch Development*

*Corp.,* 21 Utah 2d 224, 443 P.2d 663 (1968), we have never expressly resolved the question of whether Utah recognizes this tort. We now resolve that question, in the affirmative.

The plethora of decided cases and abundant literature on the tort of intentional interference with prospective economic relations has been helpful in our consideration.[3] In summarizing the history of this tort, the *Restatement (Second) of Torts,* ch. 37, "Interference with Contract or Prospective Contractual Relation" (1979), observes that its elements are a curious blend of the principles of liability for intentional torts (in which the plaintiff proves a prima facie case of liability, subject to the defendant's proof of justification) and for negligent torts (in which the plaintiff must prove liability based on the interplay of various factors). The disagreement and confusion incident to this blend of intentional and negligent tort principles has produced two different approaches to the definition of this tort.

Influenced by the model of the intentional tort, many jurisdictions and the first *Restatement of Torts* define the tort of intentional interference with prospective economic relations as a prima facie tort, subject to proof of privilege as an affirmative defense. To recover, the plaintiff need only prove a prima facie case of liability, *i.e.,* that the defendant intentionally interfered with his prospective economic relations and caused him injury. As with other intentional torts, the burden of going forward then shifts to the defendant to demonstrate as an affirmative defense that under the circumstances his conduct, otherwise culpable, was justified and therefore privileged.[4] This is the approach assumed

---

**3.** *See, e.g.,* Estes, "Expanding Horizons in the Law of Torts—Tortious Interference," 23 Drake L.Rev. 341 (1974); Harper, "Interference with Contractual Relations," 47 Nw.U.L.Rev. 873 (1953); Perlman, "Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine," 49 U.Chi. L.Rev. 61 (1982); Sayre, "Inducing Breach of Contract," 36 Harv.L.Rev. 663 (1922–23); "Developments in the Law—Competitive Torts," 77 Harv.L.Rev. 888 (1964); Note, "Tortious In-

terference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity," 81 Colum.L.Rev. 1491 (1981); "Interference with Contract Relations," 41 Harv.L.Rev. 728 (1927–28); *Annot.,* 9 A.L. R.2d 228 (1950); *Annot.,* 5 A.L.R.4th 9 (1981); *Annot.,* 6 A.L.R.4th 195 (1981).

**4.** *See, e.g., St. Louis-San Francisco Railway Co. v. Wade,* 607 F.2d 126, 132–33 (5th Cir.1979); *Buckaloo v. Johnson,* 14 Cal.3d 815, 537 P.2d 865, 872, 122 Cal.Rptr. 745, 752 (1975); *Alfred*

in several Utah decisions describing the related tort of interference with contract. *Bunnell v. Bills,* 13 Utah 2d 83, 90, 368 P.2d 597, 602–03 (1962); *Gammon v. Federated Milk Producers Association, Inc.,* 11 Utah 2d 421, 426, 360 P.2d 1018, 1022 (1961), and 14 Utah 2d 291, 295–96, 383 P.2d 402, 405–06 (1963). This approach was also suggested in a subsequent case that described (though it did not formally adopt) the tort of intentional interference with prospective economic relations. *Searle v. Johnson,* Utah, 646 P.2d 682 (1982).

The problem with the prima facie-tort approach is that basing liability on a mere showing that defendant intentionally interfered with plaintiff's prospective economic relations makes actionable all sorts of contemporary examples of otherwise legitimate persuasion, such as efforts to persuade others not to eat certain foods, use certain substances, engage in certain activities, or deal with certain entities. The major issue in the controversy—justification for the defendant's conduct—is left to be resolved on the affirmative defense of privilege. In short, the prima facie approach to the tort of interference with prospective economic relations requires too little of the plaintiff.

Under the second approach, which is modeled after other negligent torts, the plaintiff must prove liability based on the interplay of various factors. The *Restatement (Second) of Torts* now defines an actionable interference with prospective economic relations as an interference that is both "intentional" and "improper." *Id.* at § 766B.[5] Under this approach, the trier of fact must determine whether the defendant's interference was "improper" by balancing and counterbalancing seven factors, including the interferor's motive, the nature of his conduct and interests, and the nature of the interests with which he has interfered. *Id.* at § 767. In those jurisdictions which have followed the negligence model, the plaintiff bears the burden of proving that in view of all of these factors the defendant's interference was improper. This obviously imposes a very significant burden on the plaintiff and magnifies the difficulty of resolving some contested issues on the pleadings. So far as we have been able to discover, only four states have specifically adopted the *Restatement (Second)* definition of the elements of this tort,[6] though others have apparently applied some portion of the *Restatement* formulation in their own definitions.[7]

In short, there is no generally acknowledged or satisfactory majority position on the definition of the elements of the tort of

*A. Altimont, Inc. v. Chatelain, Samperton & Nolan, D.C.,* 374 A.2d 284, 289 (1977); *Owen v. Williams,* 322 Mass. 356, 360, 77 N.E.2d 318, 320–21 (1948); *Carnes v. St. Paul Union Stockyards Co.,* 164 Minn. 457, 465, 205 N.W. 630, 633 (1925); *Baker v. Dennis Brown Realty, Inc.,* 121 N.H. 640, 433 A.2d 1271, 1274 (1981); *Mitchell v. Aldrich,* 122 Vt. 19, 24, 163 A.2d 833, 836–37 (1960); *Calbom v. Knudtzon,* 65 Wash.2d 157, 162–63, 396 P.2d 148, 151–52 (1964). This approach is also adopted by F. Harper & F. James, The Law of Torts, §§ 6.11–.12 (1956); *Annot.,* 5 A.L.R.4th 9 § 2[b] (1981); and 45 Am.Jur.2d Interference § 56 (1969).

**5.** The text of Restatement (Second) of Torts § 766B (1979) states:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

**6.** *Dolton v. Capital Federal Savings & Loan Ass'n,* Colo.App., 642 P.2d 21, 23 (1981); *Weitting v. McFeeters,* 104 Mich.App. 188, 304 N.W.2d 525 (1981); *United Wild Rice, Inc. v. Nelson,* Minn., 313 N.W.2d 628, 632–33 (1982); *Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div.,* 281 Pa.Super. 560, 422 A.2d 611, 621–22 & n. 11 (1980).

**7.** *See, e.g., Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.,* Fla.Dist.Ct.App., 384 So.2d 303, 306–07 (1980); *Belden Corp. v. Internorth, Inc.,* 90 Ill. App.3d 547, 45 Ill.Dec. 765, 413 N.E.2d 98, 101–02 (1980); *Stoller Fisheries, Inc. v. American Title Insurance Co.,* Iowa, 258 N.W.2d 336, 340 (1977); *Anderson v. Dairyland Insurance Co.,* 97 N.M. 155, 637 P.2d 837 (1981).

intentional interference with prospective economic relations. In its historical review, the *Restatement (Second) of Torts* states that "the law in this area has not fully congealed but is still in a formative stage" so that the "several forms of the tort ... are often not distinguished by the courts, and cases have been cited among them somewhat indiscriminately." *Id.,* Introductory Note to ch. 37 at 5. We concur in the *Restatement (Second)*'s rejection of the prima facie tort approach because it leaves too much uncertainty about the requirements for a recognized privilege and the defendant's burden of pleading and proving these and other matters. *Id.* But we also reject the *Restatement (Second)*'s definition of the tort because of its complexity. We seek a better alternative.

Oregon has outlined a middle ground by defining the tort of interference with prospective economic relations so as to require the plaintiff to allege and prove more than the prima facie tort, but not to negate all defenses of privilege. Privileges remain as affirmative defenses. This approach originated with Justice Linde's opinion in *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Or. 201, 582 P.2d 1365 (1978). After summarizing the history of this tort and specifically refusing to require a plaintiff to prove that the interference was "improper" under the balancing-of-factors approach specified in the *Restatement (Second)*, the court defined the cause of action for "wrongful interference with economic relationships" as follows:

> Either the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships may give rise to a tort claim for those injuries.... In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means.

*Top Service Body Shop, Inc.,* 283 Or. at 205, 209, 582 P.2d at 1368, 1371. A subsequent decision of that court restated and elaborated what the plaintiff must prove, as follows:

> In *Top Service* we decided that the defendant's improper intent, motive or purpose to interfere was a necessary element of the plaintiff's case, rather than a lack thereof being a matter of justification or privilege to be asserted as a defense by defendant. Thus, to be entitled to go to a jury, plaintiff must not only prove that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; *i.e.,* that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff.

*Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371, 374 (1979). *Cf. Anderson v. Dairyland Insurance Co.,* 97 N.M. 155, 637 P.2d 837, 840–41 (1981) (nominally adopting the *Restatement (Second)* definition in Section 766B but using the Oregon elements of improper means or improper motive to define requirement that interference be "improper").

■    We recognize a common-law cause of action for intentional interference with prospective economic relations, and adopt the Oregon definition of this tort. Under this definition, in order to recover damages, the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff. Privilege is an affirmative defense, *Searle v. Johnson,* Utah, 646 P.2d 682 (1982), which does not become an issue unless "the acts charged would be tortious on the part of an unprivileged defendant." *Top Service Body Shop, Inc.,* 283 Or. at 210, 582 P.2d at 1371.

### B. Jury Instructions

In this case, the trial court apparently instructed the jury jointly on the separate intentional torts of interference with contract and interference with prospective economic relations. As noted in Part II, the

verdict cannot be sustained as to the former, so the only remaining question is whether the instruction and evidence permit the verdict to be sustained as to the latter.

So far as it related to the elements of proof of the two torts, the trial court's entire instruction was as follows:

[Isom's] counterclaim is based on a theory of tortious interference with a business relationship and with contractual rights. Before you can find the [Corporation] liable for tortious interference, you must find that the following elements have been proved by a preponderance of the evidence:

1. The existence of a valid contract or business relationship both existing and prospective;

2. Knowledge of the contract or relationship by the alleged interferor;

3. An intentional interference which causes a breach or termination of the business relationship or contract;

4. Without justification;

5. Which results in damage to the party whose business relationship or contract has been disrupted.

\* \* \* \* \* \*

You are instructed that if you find that the [Corporation] was reasonably acting to protect a legitimate economic interest of its own, arising out of or in conjunction with the May 14, 1970 agreement, was exercising its right to terminate the agreement, or was exercising its right to assert an honest claim, then the [Corporation's] conduct was justified and privileged and not wrongful or malicious and [Isom] is not entitled to recover for any intentional interference with business or contractual relations.

As to the tort of interference with prospective economic relations, this instruction does not precisely mirror the elements we have just specified, because it does not expressly require Isom to prove "improper purpose or improper means." However, the instruction does require Isom to prove that the Corporation's action was "without justification."[8] Because of the way that term was defined in the instructions, we are satisfied that the jury's verdict is premised upon findings that include each of the elements in the cause of action as we have defined it, and any disparity of phraseology between the given instruction and the new definition was not prejudicial.

Under the trial court's definition of "justification," the jury had to find that the Corporation's conduct was "wrongful or malicious" before they could find for Isom. Those terms are functionally equivalent to "improper means or improper purpose." Conversely, if the jury found that the Corporation "was reasonably acting to protect a legitimate economic interest of its own, arising out of or in conjunction with the May 14, 1970 agreement" (such as its right to terminate the agreement or to assert an honest claim thereunder), then the Corporation's conduct was "justified and privileged and not wrongful or malicious," and Isom was not entitled to recover. In view of this instruction, we conclude that the verdict for Isom was clearly based on the jury's finding that the Corporation *was not* reasonably acting to protect its legitimate economic interest under the agreement, and is tantamount to a finding that the Corporation's conduct *was* "wrongful or malicious." The trial court's instruction imposed an even heavier burden on the plaintiff (here, the counterclaimant, Isom) than our definition, since it required the plaintiff to negate the existence of any justification. Consequently, we proceed to consider whether the evidence was sufficient to sustain a verdict for the cause of action as we have defined it.

## C. Evidence of Intentional Interference and Causation

Reviewing the record, we conclude that there was sufficient evidence to sustain the jury's verdict against the Leigh

---

**8.** In *Coronado Mining Corp. v. Marathon Oil Co.,* Utah, 577 P.2d 957, 960 (1978), we stated: "The exercise of a legal right constitutes justification and is a complete defense to an action of tortious intervention of contractual rights."

Corporation for intentional interference with prospective economic relations that caused injury to Isom.

There was ample evidence that Isom had business relationships with various customers, suppliers, and potential business associates, and that Leigh, the former owner of the business, understood the value of those relationships. There was also substantial competent evidence that the Corporation, through Leigh, his wife, and his bookkeeper, intentionally interfered with and caused a termination of some of those relationships (actual or potential). Their frequent visits to Isom's store during business hours to confront him, question him, and make demands and inquiries regarding the manner in which he was conducting his business repeatedly interrupted sales activities, caused his customers to comment and complain, and more than once caused a customer to leave the store. Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy. *E.g., Guillory v. Godfrey,* 134 Cal.App.2d 628, 286 P.2d 474 (1955); *Tuttle v. Buck,* 107 Minn. 145, 119 N.W. 946 (1909); W. Prosser, *Handbook of the Law of Torts* § 130 (4th ed. 1971); *Restatement (Second) of Torts* § 766B(a).

Other actions by which the Leigh Corporation imposed heavy demands on Isom's time and financial resources to the detriment of his ability to attract and retain customers and conduct the other activities of his business included: numerous letters of complaint, Leigh's demand for an audit of Isom's books and inventory during the busy holiday season, his continued threats to cancel the contract and sell the building and business to another buyer, his refusal to pay the contracted share of the heating bills or the cost of repairing the furnace and the store's broken window, his refusal of the tendered payment of the balance due under the contract, and his suit for repossession, termination, and injunction. Leigh's refusals also prevented Isom from consummating potentially advantageous business associations with Hunter, with Talbot, and finally with Applegate, all experienced retailers able to contribute expertise and additional capital to Isom's business.

■ Taken in isolation, each of the foregoing interferences with Isom's business might be justified as an overly zealous attempt to protect the Corporation's interests under its contract of sale. As such, none would establish the intentional interference element of this tort, though some might give rise to a cause of action for breach of specific provisions in the contract or of the duty of good faith performance which inheres in every contractual relation. Even in small groups, these acts might be explained as merely instances of aggressive or abrasive—though not illegal or tortious—tactics, excesses that occur in contractual and commercial relationships. But in total and in cumulative effect, as a course of action extending over a period of three and one-half years and culminating in the failure of Isom's business, the Leigh Corporation's acts cross the threshold beyond what is incidental and justifiable to what is tortious. The Corporation's acts provide sufficient evidence to establish two of the elements in the definition of this tort: an intentional interference with present or prospective economic relations that caused injury to the plaintiff.

■ Focusing on the issue of causation, the Leigh Corporation argues that Isom's losses resulted from his inadequate working capital or from his unilateral decision to close his store immediately after being served with the complaint and to file for bankruptcy shortly thereafter. These arguments are unavailing because there was substantial evidence of causation to support the jury's verdict. For example, the jury could have found that the initiation of this lawsuit was but another instance of the Corporation's ongoing pattern of harassment, which made it impossible for Isom to continue to operate his business with any anticipation of success or profit. The parties had reached an impasse: Leigh had refused to accept Isom's tender of payment in full and had refused to permit Isom to exercise his option to purchase the building

or to associate himself with experienced partners. Upon being served with the complaint, Isom could reasonably have concluded that the Corporation's interference and harassment would continue to thwart his commercial efforts for the foreseeable future. On analogous facts, a California court held in a case involving a seller's malicious interference with his buyer's business that "it was reasonable for [the buyer] to have elected to close rather than to continue to accumulate operating expenses without receipts coming in to meet them." *Drouet v. Moulton,* 245 Cal.App.2d 667, 54 Cal.Rptr. 278, 282 (1966).

The evidence was also sufficient to support the verdict under the requirement that the intentional interference with prospective economic relations (in this case, Isom's relations with his customers, suppliers, and potential business associates) must have been for an improper purpose or by the use of improper means. These two alternatives are discussed in the next two sections.

## D. Improper Purpose

■ The alternative of improper purpose (or motive, intent, or objective) will support a cause of action for intentional interference with prospective economic relations even where the defendant's means were proper. In the context of the related tort of interference with contract, *Prosser* had this to say about improper purpose:

> Since *Lumley v. Gye* there has been general agreement that a purely "malicious" motive, in the sense of spite and a desire to do harm to the plaintiff for its own sake, will make the defendant liable for interference with a contract. The same is true of a mere officious intermeddling for no other reason than a desire to

interfere. On the other hand, in the few cases in which the question has arisen, it has been held that where the defendant has a proper purpose in view, the addition of ill will toward the plaintiff will not defeat his privilege. It may be suggested that here, as in the case of mixed motives in the exercise of a privilege in defamation and malicious prosecution, the court may well *look to the predominant purpose underlying the defendant's conduct.* [Citations omitted; emphasis added.]

W. Prosser, *Handbook of the Law of Torts* § 129 at 943 (4th ed. 1971).

Because it requires that the improper purpose predominate, this alternative takes the long view of the defendant's conduct, allowing objectionable short-run purposes to be eclipsed by legitimate long-range economic motivation. Otherwise, much competitive commercial activity, such as a businessman's efforts to forestall a competitor in order to further his own long-range economic interests, could become tortious. In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage. The law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition. Problems inherent in proving motivation or purpose make it prudent for commercial conduct to be regulated for the most part by the improper means alternative, which typically requires only a showing of particular conduct.[9]

The alternative of improper purpose will be satisfied where it can be shown that the actor's predominant purpose was to injure the plaintiff. *St. Louis-San Francisco Railway Co. v. Wade,* 607 F.2d 126, 133 (5th

---

**9.** On this same point, the Restatement (Second) of Torts holds that a competitor's interference with a prospective contractual relation is not improper if, among other things, "his purpose is at least in part to advance his interest in competing with the other." *Id.* § 768(d). The authors explain:

> The rule ... developed to advance the actor's competitive interest and the supposed social benefits arising from it. If his conduct is directed, at least in part, to that end, the fact

that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper. But if his conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper.

*Id.* § 768 comment g.

Cir.1979); *Alyeska Pipeline Service Co. v. Aurora Air Service, Inc.,* Alaska, 604 P.2d 1090 (1979); *Dunshee v. Standard Oil Co.,* 152 Iowa 618, 132 N.W. 371 (1911); *Tuttle v. Buck,* 107 Minn. 145, 119 N.W. 946 (1909); *Wesley v. Native Lumber Co.,* 97 Miss. 814, 53 So. 346 (1910); *Huston v. Trans-Mark Services, Inc.,* 45 Or.App. 801, 609 P.2d 848 (1980); Prosser, § 129, quoted *supra.*

For example, in *Alyeska Pipeline Service Co., supra,* the parties had a contract under which RCA provided a communications system along Alyeska's pipeline. RCA, in turn, contracted with Aurora to furnish air transportation along the route. About a year later, Aurora lost its contract with RCA when Alyeska elected to take over the air transportation function under a contract provision that permitted it to do so. Aurora thereupon sought damages from Alyeska, alleging that Alyeska's decision, which caused RCA to terminate its contract with Aurora, had been motivated by spite, resulting from an earlier payment dispute and litigation between Alyeska and Aurora. Alyeska pleaded that it had acted to further its own economic and safety interests. The Alaska Supreme Court upheld a jury verdict against Alyeska, explaining:

> [I]f one does not act in a good faith attempt to protect his own interest or that of another but, rather, is *motivated by a desire to injure the contract party,* he forfeits the immunity afforded by the privilege. [Authorities cited.] . . . In the case at bar, the central factual issue . . . was *whether Alyeska was genuinely furthering its own economic and safety interests or was using them as a facade for inflicting injury upon Aurora.* There was sufficient evidence upon which the jury could properly find that Alyeska was acting out of ill will towards Aurora, rather than to protect a legitimate business interest. [Emphasis added.]

604 P.2d at 1094.

■ As noted earlier, there is substantial evidence that the Leigh Corporation deliberately injured Isom's economic relations. But that injury was not an end in itself. It was an intermediate step toward achieving the long-range financial goal of profitably reselling the building free of Isom's interest. Because that economic interest seems to have been controlling, we must conclude that the evidence in this case would not support a jury finding that the Corporation's predominant purpose was to injure or ruin Isom's business merely for the sake of injury alone.

However, because we will affirm the judgment on the general verdict on any ground for which there is substantial factual support in the record, *Berger v. Southern Pacific Co.* and other authorities cited in Part II, *supra,* we must examine the record to determine whether the verdict can be supported on the basis of the alternative that the Corporation's interference was accomplished by improper means.

### E. Improper Means

■ The alternative requirement of improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. Such acts are illegal or tortious in themselves and hence are clearly "improper" means of interference, *Searle v. Johnson,* Utah, 646 P.2d 682 (1982) (secondary boycott); *Gammon v. Federated Milk Producers Association, Inc.,* 14 Utah 2d at 295–96, 383 P.2d at 405–06 (1963) (price fixing), unless those means consist of constitutionally protected activity, like the exercise of First Amendment rights. *NAACP v. Claiborne Hardware Co.,* —— U.S. ——, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Service Body Shop, Inc.,* 582 P.2d at 1371 & n. 11. Means may also be improper or wrongful because they violate "an established standard of a trade or profession." *Id.* at 1371.

■ By forcing Isom to defend what appear to have been two groundless lawsuits, the Leigh Corporation was clearly employing an improper means of interference

with Isom's business. Such use of civil litigation as a weapon to damage another's business, besides being an intolerable waste of judicial resources, may give rise to independent causes of action in tort for abuse of process and malicious prosecution. *Crease v. Pleasant Grove City,* 30 Utah 2d 451, 455, 519 P.2d 888, 890 (1974) (abuse of process); *Baird v. Intermountain School Federal Credit Union,* Utah, 555 P.2d 877, 878 (1976) (malicious prosecution); *Johnson v. Mount Ogden Enterprises, Inc.,* 23 Utah 2d 169, 169–73, 460 P.2d 333, 334–46 (1969) (malicious prosecution); W. Prosser, *Handbook of the Law of Torts* §§ 120, 121 (4th ed. 1971). The jury's verdict can therefore be sustained on the ground that the Leigh Corporation intentionally interfered with Isom's economic relations by improper means.

There is also another basis for affirming that verdict on the basis of improper means.

▆▆▆▆ A deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an "improper means." Because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort (unless the defendant's conduct would constitute a tort independent of the contract).[10]

▆▆▆▆ Neither a deliberate breach of contract nor an immediate purpose to inflict injury which does not predominate over a legitimate economic end will, by itself, satisfy this element of the tort. However, they may do so in combination. This is so because contract damages provide an insufficient remedy for a breach prompted by an immediate purpose to injure, and that purpose does not enjoy the same legal immunity in the context of contract relations as it does in the competitive marketplace. As a result, a breach of contract committed for the immediate purpose of injuring the other contracting party is an improper means that will satisfy this element of the cause of

action for intentional interference with economic relations.

Two cases illustrate how breach of contract (or lease), when done with a purpose to injure, satisfy this element of the tort. In both cases, the defendant committed a breach not just to obtain relief from its obligation under the contract or lease (for which contract damages would have made the plaintiff whole), but to achieve a larger advantage by injuring the plaintiff in a manner not compensable merely by contract damages. In both cases, the defendant ruined the plaintiff's business by its breach, and in both cases the plaintiff was given substantial damages for the tort of interference with prospective economic relations.

In *Buxbom v. Smith,* 23 Cal.2d 535, 145 P.2d 305 (1944), a retail grocery chain contracted with the plaintiff to publish and distribute a "shopping news." In order to do so, the plaintiff abandoned his printing customers and expanded his distribution organization. After becoming the plaintiff's sole customer and acquiring complete knowledge of his business, the retailer deliberately breached its contract in order to ruin the plaintiff's business by cutting off the work required to sustain it and then hired his employees. The California Supreme Court affirmed a verdict for the plaintiff, awarding damages for breach of contract and additional damages for "tortious interference with his business" in order to give him "complete recompense for his combined injuries . . . ." *Id.* at 546, 145 P.2d at 310. The gravamen of the tort, the court explained, was the defendant's breaching its contract with plaintiff as a means of acquiring plaintiff's employees:

> Although defendant's conduct may not have been tortious if he had merely broken the contract and subsequently decided to hire plaintiff's employees, an additional factor is present in this case. From the evidence the trial court could reasonably infer that *the breach, at the*

10. Likewise, for reasons discussed in the preceding section, a party whose *immediate* purpose is to inflict injury does not satisfy the

element of "improper purpose" so long as the *long-range* or predominant purpose is to further a legitimate economic end.

*time it was made, was intended as a means of facilitating defendant's hiring of plaintiff's employees. A breach of contract is a wrong and in itself actionable. It is also wrongful when intentionally utilized as the means of depriving plaintiff of his employees, and, in our opinion, constitutes an unfair method of interference with advantageous relations within the rule set forth above.* [Emphasis added.]

*Id.* at 548, 145 P.2d at 311.

In *Cherberg v. Peoples National Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137 (1977), a lessor deliberately breached its duty to repair a structurally unsound wall on the leased premises in order to destroy the restaurant business of a lessee who had leased a portion of the premises. The lessor's purpose was to retake the entire building as soon as possible, demolish the structure, and erect a more profitable building. The jury gave a verdict of $42,000 against the lessor. Apart from the $3,100 damages for breach of the lease (economic losses from temporary closure of the restaurant business), this verdict represented a recovery of damages for inconvenience, discomfort, and mental anguish for "the tort of intentional interference with business expectancies." The Washington Supreme Court sustained the verdict in an opinion that squarely relies on the combination of improper means and improper purpose in defendant's deliberate breach for the purpose of injuring the plaintiff.

After reviewing cases holding that a breach of covenants may also give rise to liability in tort, the court summarized:

It appears to be the general view that, in those instances in which the conduct of the breaching party indicates a motive to destroy some interest of the adverse party, a tort action may lie and items of damage not available in contract actions will be allowed.

*Id.* at 603, 564 P.2d at 1143. The court then acknowledged the "separate line of cases" holding that a breach of duty under a contract or a lease does not constitute an independent tort even where it interferes with

the injured party's business relations. The court explained as follows:

The distinguishing feature between the two lines of cases would seem to be whether the interference with business relations was a mere incidental consequence of the breach or a motive or purpose therefor.

*Id.* at 604, 564 P.2d at 1143. In *Cherberg,* the court found that the defendant had breached its lease and interfered with the plaintiff's business not for the "privileged" reason of escaping from an unsatisfactory return on its investment in the leased premises (upon payment of contract damages), but for the impermissible purpose of injuring the tenant in order to secure an advantage beyond the scope of the lease:

There is, instead, evidence in the record from which the jury could have inferred the lessor used the condition of the wall as a means to oust the petitioners and gain possession of the leased premises in order that the lessor might put those premises to a different and perhaps considerably more profitable use. *Proof of a breach based upon such a motive* demonstrates a failure to make a good faith effort to meet obligations under the lease and *may give rise to liability in tort.* [Emphasis added.]

*Id.* at 605, 564 P.2d at 1143–44.

As stated by the court in *Schisgall v. Fairchild Publications, Inc.,* 207 Misc. 224, 232, 137 N.Y.S.2d 312, 319 (1955):

If the defendant acted merely as a contracting party (at legal liberty perhaps to breach its agreement upon payment of damage), that is one thing. But if the defendant went further, and *acted with intent to inflict injury beyond that contemplated as a result of the mere breach of contract,* I would hold that the contract does not grant the defaulter immunity from tort liability. [Emphasis added.]

■ In the case at bar, the Leigh Corporation breached its contract in various ways.

It breached its implied duty to exercise all of its rights under the contract reasonably and in good faith. *Cahoon v. Cahoon,* Utah, 641 P.2d 140, 144 (1982); *Rio Algom Corp. v. Jimco Ltd.,* Utah, 618 P.2d 497, 505 (1980); *Ferris v. Jennings,* Utah, 595 P.2d 857, 859 (1979). Leigh's unexplained refusal to approve Isom's prospective business partners without consideration of their merits indicates an absence of good faith and provides evidence that the Corporation's breach was intended to deprive Isom's business of additional capital and valuable expertise which (at least with regard to Talbot) Leigh himself had repeatedly urged Isom to acquire. Similar refusals to approve prospective subtenants under a contract clause in order to injure the tenant's business have been held to constitute tortious interference with economic relations. *Homa-Goff Interiors, Inc. v. Cowden,* Ala., 350 So.2d 1035 (1977); *Nizzo v. Amoco Oil Co.,* Fla.Dist.Ct.App., 333 So.2d 491 (1976). In addition, Leigh, his wife, and his bookkeeper continually interrupted sales activities with their visits, letters, threats, and demands, causing customers to comment and complain and sometimes to leave. Although the contract entitled the Corporation, as lessor and secured party, to reasonable supervision of Isom's business, the jury had sufficient evidence to conclude that this conduct constituted an unreasonable exercise of contract rights and/or was done in bad faith for the purpose of injuring Isom's business relations.

The Corporation also breached its contractual duty by refusing Isom's tender of the balance of the purchase price and by refusing to appoint an appraiser to establish a price for the sale of the entire building, thereby preventing Isom from exercising his purchase option. There is evidence of Leigh's purpose in the fact that he openly regretted his contract with Isom and frequently expressed his desire to "get Richard out" of the business and building. Furthermore, he continually contacted prospective buyers for the building, even approaching two of Isom's employees for this purpose.

All of the above provide substantial evidence from which the jury could have concluded that the Corporation breached its express and implied contractual duties for the purpose of ruining Isom's business and obtaining possession of the building in order to sell it more profitably elsewhere. By themselves, the Corporation's breaches would not satisfy the requirement of "improper means," but they could do so when coupled with the improper purpose of injuring Isom. In combination, a breach of contract and an intent to injure satisfy the improper means requirement for the cause of action for intentional interference with prospective economic relations.

F. Summary

In defining the tort of intentional interference with prospective economic relations, we reject the two extremes of the prima facie tort and the balancing-of-factors approach. Instead, we adopt the Oregon definition, under which the plaintiff must prove that the intentional interference with existing or potential economic relations that caused injury to the plaintiff was done for an improper purpose or by improper means. The jury instructions in this case, which in effect required a finding that the Corporation's conduct was "wrongful or malicious," were sufficiently in harmony with this definition to permit the jury to return a verdict under it. There was sufficient evidence of intentional interference and causation.

To satisfy the alternative of improper purpose, the defendant's purpose to injure the plaintiff must predominate over all other purposes, including the long-range purpose of achieving some personal economic gain. Under this definition, the evidence is insufficient to justify a verdict against Leigh Corporation on the basis of improper purpose. Improper means refers primarily to actions that are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. The Leigh Corporation's pursuit of two groundless lawsuits against Isom was an improper means. A deliberate breach of contract for the purpose of injuring the contracting party is also an improper means, and there is also sufficient evidence to sustain the jury's verdict on that basis.

## IV. REDUCTION OF PUNITIVE DAMAGES

Leigh Furniture challenges the propriety of any damages on Isom's counterclaim, as discussed earlier, but advances no argument against the $35,000 verdict on punitive damages in particular. Isom's cross-appeal challenges the remittitur by which the district court reduced the punitive damages in reliance on the rule that the amount of punitive damages "should ordinarily bear some reasonable relation to the actual damages sustained." *Holdaway v. Hall,* 29 Utah 2d 77, 79, 505 P.2d 295, 296 (1973). Following the "guide" of *Kesler v. Rogers,* Utah, 542 P.2d 354 (1975), and *Prince v. Peterson,* Utah, 538 P.2d 1325 (1975), where this Court reduced punitive damages to an amount equal to twenty and eighteen percent of the compensatory damages, respectively, the district court found that $13,000 (exactly twenty percent of the compensatory damages awarded by the jury in this case) would adequately accomplish the purpose of punitive damages, and reduced them by remittitur to that amount. Isom asserts error in this mechanical application of a fixed ratio as a basis for such reduction. We agree.

The purposes of punitive damages are well stated in *Kesler v. Rogers, supra:*

> They are: a punishment of the defendant for particularly grievous injury caused by conduct which is not only wrongful, but which is wilful and malicious so that it seems to one's sense of justice that mere recompense for actual loss is inadequate and that the plaintiff should have added compensation; and that the defendant should suffer some additional penalty for that character of wrongful conduct; and also that such a verdict should serve as a wholesome warning to others not to engage in similar misdoings.

542 P.2d at 359. *Accord Branch v. Western Petroleum, Inc.,* Utah, 657 P.2d 267 (1982). As reflected in this statement of purpose and in numerous other authorities, punitive damages are awarded "where the nature of the wrong complained of ... *goes beyond merely violating the rights of another in that it is found to be willful and malicious," Elkington v. Foust,* Utah, 618 P.2d 37, 41 (1980) (emphasis added), or a result of "reckless indifference toward, and disregard of" the rights of others. *Branch v. Western Petroleum, Inc., supra.*[11]

We have recently had occasion to review the factors that the fact-finder should consider in determining the amount of punitive damages. *See First Security Bank of Utah, N.A. v. J.B.J. Feedyards, Inc.,* Utah, 653 P.2d 591 (1982). For purposes of this case, we need only reemphasize that the amount of compensatory damages is only one of a significant number of factors to be considered in that determination. *Terry v. Zions Cooperative Mercantile Institution,* Utah, 605 P.2d 314, 328 (1979), modified on another point, 617 P.2d 700 (1980). The district court's reduction of punitive damages solely on the basis of that factor was therefore in error.

The jury (or other fact-finder) has "a broad discretion" in weighing the various factors and arriving at its determination of an appropriate award of punitive damages. *Ostertag v. La Mont,* 9 Utah 2d 130, 133, 339 P.2d 1022, 1024 (1959). The standards that guide a court in reviewing the jury's determination are also reviewed and reaffirmed in *First Security Bank v. J.B.J. Feedyards, supra,* and need not be repeated here. This jury found $65,000 compensatory damages and $35,000 punitive damages. We find nothing in the ratio between those two amounts, or in the other circumstances of this case, to persuade us that the award of punitive damages was "so flagrantly excessive and unjust as to indicate a disregard of the rules of law by which damages are regulated," or "so grossly excessive and disproportionate to the injury" or "so excessive as to be shocking to one's conscience and to clearly indicate pas-

11. We do not address the question of whether the theory of punitive damages would permit their award for an intentional tort, one of whose elements is malice (improper purpose). That circumstance is not before us.

sions, prejudice or corruption on the part of the jury." *First Security Bank v. J.B.J. Feedyards, supra,* at 11.[12]

The record contains abundant evidence that Leigh Furniture interfered with Isom's economic relations by improper means, including breaching its contract with the intent to injure Isom, a circumstance from which the jury could infer sufficient malice to justify their award of punitive damages. Economic motives will not insulate a defendant from liability for punitive damages where he acts maliciously. *Fury Imports, Inc. v. Shakespeare Co.,* 554 F.2d 1376 (5th Cir.1977), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 349 (1981); *Cherne Industrial, Inc. v. Grounds & Associates, Inc.,* Minn., 278 N.W.2d 81 (1979).

On Isom's cross-appeal, the judgment is modified to reinstate the full amount the jury awarded as punitive damages.

As modified in respect to punitive damages, the judgment on the verdict for defendant Isom is affirmed. Costs to respondent.

HALL, C.J., STEWART, J., and VeNOY CHRISTOFFERSEN, District Judge, concur.

DURHAM, J., does not participate herein.

HOWE, Justice (concurring):

I concur in the majority opinion but express a reservation as to the following sentence in Part II:

· [W]here more than one cause of action has been submitted to a jury and where one of those causes of action was error-free, supported by substantial evidence, and an appropriate basis for the general verdict, the judgment on that verdict will

be affirmed, even though the evidence was insufficient to sustain the verdict on one of the other causes of action submitted.

Under my view of the instruction given the jury, set out in Part III B, it is unnecessary to take any position on the principle above quoted because that principle is not involved in this case. Even though the instruction instructed jointly on the tort of interference with contract and the tort of interference with prospective economic relations, it did not offer alternatives or choices to the jury as to the separate torts or theories of recovery. The jury could not have been conscious that they were being instructed on two separate torts. They were not told that they could choose between them. I agree with the majority opinion that the instruction properly defined the tort of interference with prospective economic relations and we must presume that the jury followed the instruction in finding liability against the defendant. The fact that the instruction may have also defined another tort which does not lie in this case is of no consequence. There was competent evidence adduced to support the elements of interference with prospective economic relations as illustrated by the cases of *Cherberg v. Peoples National Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137 (1977) and *Buxbom v. Smith,* 23 Cal.2d 535, 145 P.2d 305 (1944). It should be noted that in both of those cases one contracting party committed that tort on the other contracting party. No third party was involved.

While I recognize that the principle quoted above, which is called the "two issue rule," is supported by the cases from the

---

**12.** Where appropriate, we have affirmed punitive damage awards much in excess of the amount of compensatory damages awarded. *See Elkington v. Foust,* Utah, 618 P.2d 37, 41 (1980) (compensatory $12,000; punitive $30,000); *Powers v. Taylor,* 14 Utah 2d 152, 379 P.2d 380 (1963) (compensatory $350 to one plaintiff and $1,000 to another; punitive $1,500); *Ostertag v. La Mont,* 9 Utah 2d 130, 339 P.2d 1022 (1959) (actual damages $140; punitive $860); *Evans v. Gaisford,* 122 Utah 156, 161–64, 247 P.2d 431, 433–35 (1952) (gen-

eral and special damages $900; punitive $1,000); *Falkenberg v. Neff,* 72 Utah 258, 270–72, 269 P. 1008, 1013 (1928) (actual damages $362.50; punitive $1,500); and cases cited with approval in *Holdaway v. Hall,* 29 Utah 2d 77, 79–80, 505 P.2d 295, 296 (1973). Moreover, in at least one case, we have held that punitive damages may be awarded where only equitable relief was granted and no compensatory damages were awarded. *Nash v. Craigco, Inc.,* Utah, 585 P.2d 775 (1978).

jurisdictions cited in the majority opinion, there is a contrary point of view exemplified by the following cases: *Bredouw v. Jones,* Okl., 431 P.2d 413 (1967); *Heinen v. Heinen,* 64 Nevada 527, 186 P.2d 770 (1947); *Martin v. Northern Pac. Ry.,* 51 Mont. 31, 149 P. 89 (1915). Apparently this Court has not heretofore decided this question and I prefer to reserve an expression of opinion on it until it is squarely before us. See *Ivie v. Richardson,* 9 Utah 2d 5, 336 P.2d 781 (1959) and *Watters v. Querry,* Utah, 588 P.2d 702 (1978) for examples of a somewhat similar situation arising because of conflicting jury instructions.