John P. SAMPSON and Milton R. Goff, individually, and as trustee of Milton R. Goff Trust, an unincorporated association, Plaintiffs, Appellants, and Cross–Respondents,

v.

Paul H. RICHINS; Richtron, Inc., a Utah corporation; Richtron Financial Corporation, a Utah corporation; Richtron General, a Utah corporation, and Frontier Investments, a Utah corporation, Defendants, Respondents, and Cross–Appellants.

No. 880257–CA.

Court of Appeals of Utah.

Feb. 22, 1989.

Craig S. Cook, Salt Lake City, for plaintiffs, appellants, and cross-respondents.

John T. Anderson, Salt Lake City, for defendants, respondents, and cross-appellants.

Before BILLINGS, JACKSON and ORME, JJ.

## OPINION

BILLINGS, Judge:

Plaintiff-appellant, John P. Sampson, appeals the money judgment entered against him in favor of defendants-respondents, Richtron, Inc., Richtron Financial Corporation, and Richtron General (referred to collectively throughout this opinion as "Richtron"). The trial court found Sampson intentionally interfered with Richtron's economic relations and awarded judgment to 1) Richtron Financial Corporation, as a limited partner, in the amount of $30,974.50, 2) Richtron, Inc., as a limited partner, in the amount of $4,222.50, and 3) Richtron, Inc. and Richtron General, as general partners, in the amount of $250,000. Richtron cross-

appeals the trial court's refusal to award additional compensatory and punitive damages. We affirm.

## PROCEDURAL POSTURE

Sampson filed the original complaint in this case to enforce an Oregon judgment previously obtained by Robert Osborn against Richtron which Sampson subsequently purchased from Osborn. Richtron answered the complaint alleging a variety of defenses to the Oregon judgment, and counterclaimed seeking six affirmative claims for relief against Sampson.

The case was tried without a jury before Senior Judge Bryant Croft. During the eleven-day trial, the court heard twenty-three witnesses and received approximately 398 exhibits. Judge Croft drafted a 177 page "memorandum and summation of evidence" and entered "findings of fact and conclusions of law and verdict" consisting of 234 pages. Both counsel in their briefs and this court commend Judge Croft for his extraordinary efforts.

In bringing this appeal, Sampson ordered only a portion of the transcript of the proceedings below. Subsequent motions to supplement the record were denied. Richtron did not order additional portions for purposes of its cross-appeal. Consequently, both parties concede they are bound by Judge Croft's voluminous findings of fact, and only contend on appeal that the trial court's findings of fact do not support its conclusions of law and judgment. Specifically, Sampson claims the trial court's findings do not support the elements of intentional interference with Richtron's economic relations nor the corresponding damages awarded to Richtron. Richtron cross-appeals claiming the trial court erred 1) in refusing to award additional compensatory damages for partnership funds diverted by Sampson and for loans Richtron advanced to the partnerships, and 2) in refusing to award Richtron punitive damages.

## FACTS

We set out only those facts found by the trial court that are relevant to the issues on appeal. Between October 15, 1973, and March 1, 1980, Paul Richins created twenty-five limited partnerships in which either Richtron, Inc., or Richtron General, its subsidiary, acted as the sole general partner. Both Richtron, Inc. and Richtron General were owned and controlled by Richins. The limited partnerships were created for the purpose of acquiring, operating, and holding for resale farm properties located in the states of Utah, Idaho, and Oregon.

Substantially identical limited partnership agreements were prepared for each of the twenty-five partnerships providing, in relevant part, that the general partner had the exclusive authority to conduct the affairs of the limited partnerships, and that the limited partners were required to make annual cash contributions to meet partnership expenses. The agreements disclosed that the agricultural properties previously purchased on contract by one of the Richtron companies were being resold to the limited partnerships at a profit.

During 1979 and early 1980, many of the limited partners refused to pay the partnership expense assessments made by Richtron. By May 1980, the limited partnerships were confronted with substantial and increasing financial difficulties due, in part, to the failure of many limited partners to pay their agreed assessments and, in part, to overall management problems. As a result, Richtron loaned substantial amounts of money to the limited partnerships to meet delinquent and current land contract installment obligations, well-drilling expenses, as well as other operating expenses. By June 1980, the aggregate amount of Richtron's loans, all of which were required by the partnership agreements to be repaid, exceeded $300,000.

Sampson first became involved with the limited partnerships in May 1980, when he was retained as an attorney by two limited partners to attend a meeting of the Catlow Valley limited partners. Richins called the meeting to discuss, among other financial concerns, the existence of the "Osborn judgment" and that Osborn was willing to settle the dispute upon payment of a stipulated sum. The trial court made the fol-

lowing findings concerning Sampson's participation in the May 1980 meeting:

> [Sampson's] actions there were a bit more than just privately counseling his two clients, for he not only orally recommended to those at the meeting and got started the movement to have Richtron Financial file for bankruptcy under Chapter 11 proceedings, but he also expressed the legal opinion to all present that he did not think Richtron Financial could keep the mark-up equity arising from Richtron Financial's resale of the farm property to the Catlow Valley partnerships for an amount in excess of what it paid for it, which was a theme which Sampson repeatedly expressed in the months and years ahead.

It was at this meeting that Sampson began his concentrated efforts to take control of the twenty-five limited partnerships. Sampson never invested in any of the partnerships, and from all indications, throughout his efforts, represented only two of approximately 130 limited partners.

In June 1980, as a result of ongoing pressure from Sampson, Richins purported to cause the withdrawal of Richtron, Inc. and Richtron General as general partners of the limited partnerships. Richins informed the limited partners that he would proceed to wind up and terminate partnership affairs, but none of the partnerships were ever terminated. Following his announcement, Richins agreed to permit Sampson to receive partnership assessments. Under this agreement, Sampson was required to forward funds to Richtron to pay pressing partnership obligations. Sampson did not comply with the agreement, and instead placed partnership contributions in his trust accounts.

At the Catlow Valley partnership meeting, Sampson suggested to his clients that they purchase all of Richtron's interests in the limited partnerships. Thereafter, Sampson and Richins attempted to negotiate a buy-out of Richtron's interests for $700,000. The buy-out agreement provided that Richtron would be reimbursed for the loans it had made to the limited partnerships. Despite the negotiations between Sampson and Richins, Sampson informed a number of limited partners that Richtron was not entitled to repayment. Sampson expressed this opinion frequently both orally and through letters sent to all investors. As a result of Sampson's statements, many of the limited partners objected to the buy-out agreement, and no sale of Richtron's interest occurred. Soon after the buy-out agreement failed, Sampson resumed his efforts to take control of the partnerships and exclude Richins.

Sampson first attempted to gain control by requesting the limited partners to execute powers of attorney. Sampson told the partners that such action was necessary to remove Richins and his companies as general partners and to commence legal action against them.

After obtaining powers of attorney from an unknown number of limited partners, Sampson incorporated the John P. Sampson Professional Corporation. Relying on the powers of attorney, Sampson attempted to elect his professional corporation as the successor general partner of each of the limited partnerships, in violation of the Utah Professional Corporation Act, Utah Code Ann. §§ 16–11–1 to –15 (1987).

Sampson was notified by court order that his corporation was not authorized to become a general partner in an agricultural enterprise. Thereafter, Sampson incorporated Ag Management, and attempted to substitute it as general partner of the limited partnerships. On November 24, 1982, a district court ruled that Sampson's efforts to substitute Ag Management as the general partner were legally invalid, and that Richtron was and always had been the only authorized general partner to act on behalf of the limited partnerships.

Within seven months of Sampson's attendance at the Catlow Valley partnership meeting, Sampson had assumed actual but not legal control of the twenty-five partnerships through a variety of means and was receiving and disbursing all partnership funds at his discretion. He continued his unauthorized control for over four years acting both in his individual capacity and as an attorney representing the interests of

two limited partners. During this same period, Sampson also acted as legal counsel for Richtron, and on several occasions defended Richtron in lawsuits. In at least five instances, however, Sampson neglected the lawsuits against Richtron and allowed them to go to default. Sampson, on other occasions, revealed to third parties confidential information he had obtained in the course of his representation of Richtron.

During the summer of 1982, Sampson frequently contacted the Internal Revenue Service, and provided it with information concerning Richtron's internal business affairs. Eventually, the IRS conducted a tax sale wherein Sampson appeared as the only bidder, and purportedly acquired substantially all of Richtron's assets. A United States district court judge voided the tax sale by court order dated May 16, 1984.

From June 27, 1980, to October 29, 1984, approximately $1,522,000 in limited partnership funds were deposited in the various accounts over which Sampson had control. From these accounts, Sampson withdrew over $100,000 in attorney fees and $78,000 to cover miscellaneous overhead expense. Despite several federal and state court orders declaring that neither Sampson nor Ag Management were authorized to act as general partners, Sampson continued to solicit and receive funds from limited partners and exercise control over the various limited partnerships. The trial court also found that throughout Sampson's four-year period of control, he repeatedly ignored Richtron's *limited partnership* interests by failing to communicate and generally keep Richtron abreast of partnership activities.

Based on the facts set forth above, Judge Croft concluded that Sampson's intentional neglect of Richtron Financial's and Richtron, Inc.'s limited partnership interests caused them to lose their original capital contributions. Accordingly, Judge Croft awarded Richtron Financial $30,974.50, and Richtron, Inc. $4,222.50, which represented their respective capital interests. Finally, Judge Croft awarded Richtron General and Richtron, Inc., as general partners, $250,000 based on Sampson's intentional interference with their economic relations.

Both Sampson and Richtron argue on appeal that the trial court's legal conclusions and judgment are not supported by its findings of fact. As a subsidiary issue, Sampson claims that many of Judge Croft's "findings of fact" are really "conclusions of law," and therefore, his challenges are properly before this court notwithstanding his failure to order a complete transcript of the proceedings below.

## STANDARD OF REVIEW

R.Utah Ct.App. 11(e)(2) provides, with our emphasis, "[i]f the appellant intends to urge on appeal that a *finding* or *conclusion* is unsupported by or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion." In essence, Rule 11 directs counsel to provide this court with *all evidence* relevant to the issues raised on appeal. "Where the record before us is incomplete, we are unable to review the evidence as a whole and must therefore presume that the verdict was supported by admissible and competent evidence." *Smith v. Vuicich*, 699 P.2d 763, 765 (Utah 1985). *Accord Bevan v. J.H. Constr. Co.*, 669 P.2d 442, 443 (Utah 1983) (in absence of a transcript, we presume the trial proceedings were proper and judgment was supported by the evidence).

■ Accordingly, because the entire record in this case is not before this court, we presume the trial court's findings are supported by competent and sufficient evidence, "[h]owever, ... the findings must themselves be sufficient to provide a sound foundation for the judgment, and conversely ... any proper judgment can only be entered in accordance with the findings." *Forbush v. Forbush*, 578 P.2d 518, 519 (Utah 1978). Therefore, our review is strictly limited to whether the trial court's findings of fact support its conclusions of law and judgment.

In this regard, findings of fact "must clearly indicate the 'mind of the court' and must resolve all issues of material fact

necessary to justify the conclusions of law and judgment entered thereon." *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 601 (Utah 1983) (footnotes omitted). *See also Kinkella v. Baugh*, 660 P.2d 233, 236 (Utah 1983) (failure to enter adequate findings of fact is generally reversible error). "Findings should be limited to the ultimate facts and if they ascertain ultimate facts, and sufficiently conform to the pleadings and the evidence to support the judgment, they will be regarded as sufficient...." *Pearson v. Pearson*, 561 P.2d 1080, 1082 (Utah 1977). A trial court need not resolve every conflicting evidentiary issue, "[n]or is the court required to negate allegations in its findings of facts." *Sorenson v. Beers*, 614 P.2d 159, 160 (Utah 1980).

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

In order to sustain a claim for intentional interference with prospective economic relations in Utah, a plaintiff must establish, "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations,[1] (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).[2]

### Improper Purpose or Means

■ In order to establish "improper purpose" a plaintiff must demonstrate that the defendant's interference is maliciously motivated, " 'in the sense of spite and a desire to do harm to the plaintiff for its own sake....' " *Leigh Furniture*, 657 P.2d at 307 (quoting W. Prosser, *Handbook of Law of Torts* § 129 at 943 (4th ed. 1971)). In a case of mixed motives, a court must determine the defendant's predominant purpose underlying his conduct. *Id.* "Problems inherent in proving motivation or purpose make it prudent for commercial conduct to be regulated for the most part by the improper means alternative, which typically requires only a showing of particular conduct." *Id.*

The improper means element "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. Such acts are illegal or tortious in themselves and hence are clearly 'improper' means of interference." *Leigh Furniture*, 657 P.2d at 308 (citations omitted). Improper means may also include " 'violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods.' " *Id.* (quoting *Top Serv. Body Shop, Inc.*, 582 P.2d at 1371). "Means may also be improper or wrongful because they violate 'an established standard of a trade or profession.' " *Id.*

With the foregoing principles in mind, we address Sampson's challenges in this ap-

---

1. The Utah Supreme Court has declared that the tort of intentional interference with economic relations protects both a party's existing contracts and "interest in prospective relationships not yet reduced to a formal contract (and perhaps not expected to be)." *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982).

2. In announcing the elements of a prima facie case, the Court discussed the history and development of intentional interference with economic relations, noting that the "blend of intentional and negligent tort principles has produced two different approaches to the definition of this tort." *Leigh Furniture*, 657 P.2d at 302. The first approach, followed by many jurisdictions and included in the first Restatement of Torts, requires a plaintiff to demonstrate that "the defendant intentionally interfered with his prospective economic relations and caused him injury." *Id.* The defendant then bears the burden of asserting privilege or justification as an affirmative defense. *Id.* The second approach, modeled after other negligent torts, requires a plaintiff to prove "liability based on the interplay of various factors." *Id.* at 303. This alternative approach is memorialized in the Restatement (Second) of Torts § 766B (1979). It is important to emphasize that the Utah Court expressly rejected both approaches and chose, instead, to follow "a middle ground" previously adopted by the Oregon courts. *Id.* at 304 (citing *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365 (1978)). Under Utah's approach, improper purpose or means must be established as part of a prima facie case and privilege is an affirmative defense, which only becomes relevant if " 'the acts charged would be tortious on the part of an unprivileged defendant.' " *Id.* at 304 (quoting *Top Serv. Body Shop, Inc.*, 582 P.2d at 1371).

peal. First, Sampson claims the trial court's "findings" that Sampson had an "improper purpose" and employed "improper means" are ultimate facts or, in the alternative, conclusions of law, and are not supported by the trial court's operative findings of fact. Conversely, Richtron claims that these "findings" are indeed findings of fact, and absent the entire record, are not subject to attack on appeal. *See, e.g., Cornish Town v. Koller,* 758 P.2d 919, 922 (Utah 1988).

We think the trial court's "findings of fact" that Sampson employed "improper means" or had an "improper purpose" are more accurately considered "mixed questions of law and fact." Cases involving the application of law to facts are hopelessly at odds with one another as to whether the issue should be reviewed as a factual finding or a legal conclusion. *See* Weiner, *The Civil Nonjury Trial and Law–Fact Distinction,* 55 Calif.L.Rev. 1020, 1021–22 (1967). *See also* Calleros, *Title VII and Rule 52(a): Standards of Appellate Review in Disparate Treatment Cases—Limiting the Reach of Pullman–Standard v. Swint,* 58 Tul.L.Rev. 403, 416–17 (1983). However, we need not resolve the appropriate standard of review, as we find the trial court's voluminous and detailed operative factual findings overwhelmingly support its ultimate determination that Sampson employed *improper means* as is discussed more fully below. Furthermore, because we need only find *either* "improper purpose" or "improper means" to uphold the trial court, we do not address the issue of "improper purpose."

Based on our review of Judge Croft's findings of fact, we note at least thirteen acts that, taken together, constitute improper means as defined by the Utah Court in *Leigh Furniture.* Specifically, these acts include:

1. Sampson repeatedly misrepresented to the limited partners that Richtron was not entitled to be reimbursed for the capital advances it made to the limited partnerships or the disclosed mark-ups on the agricultural property sold to each of the limited partnerships.

2. Sampson's frequent false statements that Richtron was not entitled to its loan advances or mark-ups prevented an early settlement of the limited partnership affairs.

3. Sampson undertook representation of Richtron in several matters and at the same time, undertook representation of interests that were clearly adverse to Richtron in violation of the Code of Professional Responsibility.

4. After agreeing to represent Richtron's legal interest in civil matters, Sampson ignored these matters, and allowed at least five cases to go to default judgments against Richtron.

5. Sampson disclosed to third parties confidential information he obtained during the course of his representation of Richtron in violation of his professional and fiduciary obligations.

6. Sampson repeatedly breached his original agreement to serve as a repository for the deposit of partnership funds and insure that all such funds were duly transmitted to Richtron. Instead, Sampson placed partnership funds in his trust accounts.

7. Sampson's unauthorized control over the various limited partnerships for a period in excess of four years included receiving and disbursing said limited partnership funds. In doing so, Sampson repeatedly directed limited partners to send money to him and not to Richtron.

8. Sampson executed invalid powers of attorney, and attempted to use those powers to substitute his newly created professional corporation organized for the purpose of practicing law, as a general partner to an agricultural partnership, in violation of the Utah Professional Corporation Act, Utah Code Ann. §§ 16–11–1 to –15 (1987).

9. After discovering he could not substitute his professional corporation as a general partner, Sampson attempted to substitute his newly created corporation, Ag Management, as general partner of the partnerships. Despite a district court order in 1982, declaring that

Sampson's efforts were legally invalid, Sampson continued to exercise unauthorized control over the partnerships.

10. Sampson violated the Utah Limited Partnership Act, Utah Code Ann. §§ 48–2–1 to –27 (1989), by refusing to amend the certificates of the limited partnerships.

11. Sampson provided information to the Internal Revenue Service for the purpose of expediting a tax sale of Richtron's interests. Thereafter, Sampson appeared as the only bidder at the sale.

12. Despite a federal district court ruling that the IRS tax sale was void, Sampson continued to exercise control over the partnerships, and also continued to receive partnership funds.

13. Sampson purchased the "Osborn judgment" in violation of Utah Code Ann. § 78–51–27 (1987).[3]

■ Notwithstanding the overwhelming nature of his conduct, Sampson claims the trial court failed to consider his "good faith efforts" in undertaking a majority of the actions which the trial court ultimately found constituted improper means. His po-

sition is untenable. Negating "good faith" is not an element of a prima facie case of intentional interference with economic relations in Utah.[4] *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 304 (Utah 1982). Moreover, the trial court's findings negate any conclusion that Sampson acted in "good faith."

■ Finally, if Sampson uses the term "good faith" in the sense that he is claiming his acts were "privileged," Sampson bears the burden of raising this issue as an affirmative defense. *See Leigh Furniture,* 657 P.2d at 304. Sampson did not raise good faith or privilege as an affirmative defense, and he is now precluded from raising it for the first time on appeal. *See James v. Preston,* 746 P.2d 799, 801 (Utah Ct.App.1987).

In conclusion, Sampson's conduct is far more egregious than the conduct found sufficient to constitute improper means in *Leigh Furniture.* *See* 657 P.2d at 306. We have identified thirteen acts justifiedly labeled "improper means," spanning a period of well over four years, and although "[t]aken in isolation, each of the foregoing

---

3. Section 78–51–27 provides:

An attorney or counselor shall not:

(1) directly or indirectly buy, or be in any manner interested in buying or having assigned to him, for the purpose of collection, a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose of bringing an action thereon.

(2) by himself, or by or in the name of another person, either before or after action brought, promise or give, or procure to be promised or given, a valuable consideration to any person as an inducement to placing, or in consideration of having placed, in his hands or in the hands of another person a demand of any kind for the purpose of bringing action thereon or of representing the claimant in the pursuit of any civil remedy for the recovery thereof; but this subdivision does not apply to any agreement between attorneys and counselors to divide between themselves the compensation to be received.

An attorney or counselor who violates either of the foregoing subdivisions of this section is guilty of a misdemeanor and shall be punished accordingly, and his license to practice may be revoked or suspended.

4. Sampson relies on authority from jurisdictions taking a different approach to the tort of

intentional interference with economic relations. For instance, Sampson cites a Texas decision wherein the court found that the defendant acted in good faith which justified his interference with the plaintiff's contract. *See American Petrofina, Inc. v. PPG Indus., Inc.,* 679 S.W.2d 740, 758 (Tex.Ct.App.1984). However, Texas courts do not require, as part of a prima facie showing, that the defendant acted "improperly." Rather, a plaintiff need only demonstrate 1) the existence of a contract, 2) intentional and willful interference, 3) proximate causation, and 4) actual loss. *Id.* Additionally, on at least one other occasion, a Texas court held that it was incumbent upon the defendant to prove that his acts were either justified or privileged. *Armendariz v. Mora,* 553 S.W.2d 400, 405 (Tex.Civ.App. 1977).

Similarly, Sampson cites Arizona authority where the court found that the violation of a statute was outweighed by the defendant's good faith reliance on a letter from a state agency authorizing his conduct. *See G.M. Ambulance and Medical Supply Co., v. Canyon State Ambulance, Inc.,* 153 Ariz. 549, 551, 739 P.2d 203, 205 (Ct.App.1987). However, Arizona follows the Restatement (Second) of Torts approach, one specifically rejected by our Supreme Court. *See Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 304 (Utah 1982).

interferences with [Richtron's interests] might be justified as an overly zealous attempt to protect [Sampson's interests in representing his clients]," *Leigh Furniture*, 657 P.2d at 306, the cumulative effect, culminating in the failure of the limited partnerships, "cross[ed] the threshold beyond what is incidental and justifiable to what is tortious." *Id.*

### Causation

█ Sampson claims the trial court's "conclusion" that Sampson's interference caused Richtron injury is not supported by the trial court's findings of fact, or in the alternative, the findings are inconsistent with a conclusion of causation. Whether causation has been established is a question of fact, *see* W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts* § 129 at 991 (5th ed. 1984), and in the absence of a complete record, we assume the trial court's finding of causation is supported by the evidence. *See, e.g., Cornish Town v. Koller*, 758 P.2d 919, 922 (Utah 1988).

█ Furthermore, Sampson's claims of error with regard to causation are more appropriately directed to the issue of damages. First, Sampson claims that the limited partnership agreements were terminable at will, thereby giving either party the absolute right to withdraw from the obligation at any time. Therefore, according to Sampson, Richtron had no right to continue its control over the limited partnerships in the future. Second, Sampson claims the court's finding that "by May, 1980, Richins and his companies had become confronted with substantial financial problems, as well as others likewise mentioned elsewhere, which were of such magnitude that success in overcoming them seemed doubtful," precludes or is inconsistent with a conclusion that Sampson's intentional interference caused Richtron injury.

As to the first claim, Sampson acknowledges in his brief "at will termination is normally one properly of damages rather than causation." As to the second claim, there are substantial findings to support the trial court's ultimate finding that Sampson's conduct caused Richtron loss. Richtron operated the partnerships for many years without foreclosures, and despite financial difficulties in 1980, Sampson offered $700,000 for Richtron's interests in the limited partnerships at the time he now claims those interests had no value. Sampson's offer is evidence that he considered Richtron's interests worth a substantial amount of money notwithstanding the purported financial difficulties of the time. Based on the foregoing, we affirm the trial court's finding of causation.[5]

### DAMAGES

Sampson's primary argument on appeal is that the damage awards are not supported by the trial court's findings of fact. Specifically, Sampson claims the court erred in awarding 1) $250,000 to Richtron, Inc. and Richtron General as "consequential damages," and 2) $30,974.50 to Richtron Financial and $4,222.50 to Richtron Inc. representing their original capital contributions to certain limited partnerships.

We emphasize that neither party is in a position to challenge the sufficiency of the evidence to support damages or the trial court's findings of fact based thereon. Rather, our review is limited to whether the trial court's findings of fact support its award of damages.

█ The Restatement (Second) of Torts § 774A at 55 (1979), provides that one who is ultimately deemed liable to another for interference with economic relations is liable for "the pecuniary loss of the benefits of the contract or the prospective relation; [or] consequential losses for which the interference is a legal cause. . . ." Thus, Judge Croft's findings must identify actual

---

**5.** Sampson further asserts that Richtron's claim for intentional interference with economic relations is barred by the doctrines of waiver and estoppel, and the trial court's failure to so find constitutes reversible error. A trial court is not required to negate all allegations in its findings of fact, *Sorenson v. Beers*, 614 P.2d 159, 160 (Utah 1980), and based on the findings of fact, we affirm the trial court's conclusion that Sampson failed to establish waiver or estoppel.

pecuniary losses suffered by Richtron as a result of Sampson's conduct.

With respect to the $250,000 award to Richtron, Inc. and Richtron General, the trial court made the following observation:

As stated before, damages are in tort, not in contract, rendering liability for damages for either the pecuniary loss of the benefits of the contract or consequential for which the tortious interference is the legal cause. I think that as to some claims for relief, damages, of at least a consequential nature, have been shown with a reasonable degree of certainty by a preponderance of the evidence.

Sampson claims it was error for the trial court to refuse to identify the precise composition of the $250,000 award. We agree that Judge Croft was under the mistaken belief that he need not identify the exact basis for his award. However, this court can affirm the judgment if *any legal basis* exists to justify the trial court's award. *See, e.g., Beuhner Block Co. v. UWC Assocs.,* 752 P.2d 892, 895 (Utah 1988).

■ We note that in the context of a damage award, a trial court's findings of fact must provide a sufficient basis for this court to determine whether there is a rational legal basis as well as a sufficient factual basis for the award of damages. *See, e.g., Bastian v. King,* 661 P.2d 953, 957 (Utah 1983). However,

[a]lthough an award of damages based only on speculation cannot be upheld, it is generally recognized that some degree of uncertainty in the evidence of damages will not suffice to relieve a defendant from recompensing a wronged plaintiff. *As long as there is some rational basis for a damage award, it is the wrongdoer who must assume the risk of some uncertainty. Where there is evidence of the fact of damage, a defendant may not escape liability because the amount of damage cannot be proved with precision.*

*Id.* at 956 (emphasis added).

Further, "[o]nce a defendant has been shown to have caused a loss, ... the reasonable level of certainty required to estab-

lish the *amount* of a loss is generally lower than that required to establish the *fact* or *cause* of a loss." *Cook Assocs., Inc. v. Warnick,* 664 P.2d 1161, 1166 (Utah 1983) (citations omitted) (emphasis in the original). *Accord Sawyers v. FMA Leasing Co.,* 722 P.2d 773, 774 (Utah 1986); *Terry v. Panek,* 631 P.2d 896, 898 (Utah 1981). "The amount of damages may be based upon approximations, if the fact of damage is established, and the approximations are based upon reasonable assumptions or projections." *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.,* 709 P.2d 330, 336 (Utah 1985).

■ Judge Croft found that as of May 16, 1984, "Judge Winder's order ended then and there ... [Sampson's] right to take any further steps in the windup of any affairs of any partnership in which the Richtron Companies remained as general partners...." Despite Judge Winder's order, Sampson continued from that point to hold and collect additional partnership funds. Accordingly, Judge Croft's finding provides a reasonable legal basis for awarding Richtron damages for Sampson's wrongful use and control of partnership funds from the date of Judge Winder's order.

■ Judge Croft's findings as to the amount of funds wrongfully retained by Sampson after May 16, 1984, include:

From the evidence the only information the court has is that as of the date Judge Winder made his ruling, the Ag Management account had a balance of about $28,700 which by October 29, 1984 had increased to over $43,000, while the account balance of Consolidated Farms as of October 29, 1984 was $245,597, with $74,320 having been received since Judge Winder's ruling and $12,000 having been disbursed....

From these findings, it is clear that following Judge Winder's order, which unequivocally denounced Sampson's interest in partnership assets, the trial court concluded that Sampson deprived Richtron of the use and control of approximately $290,000. There are admittedly alternative, inconsistent findings before this court, and ordinari-

ly we would resort to the underlying record to determine which finding of fact is accurate. However, Sampson's failure to provide a complete transcript prevents us from reviewing the underlying evidence. Thus, we assume the evidence supports the trial court's findings of fact which in turn supports its ultimate damage award. *See, e.g., Cornish Town v. Koller,* 758 P.2d 919, 922 (Utah 1988). Accordingly, we find that the trial court's award of damages to Richtron, Inc. and Richtron General has a rational basis and is supported by the trial court's findings of fact.

Finally, Sampson appeals the trial court's award of damages to Richtron Financial and Richtron, Inc. in the amount of their original capital investment in their respective limited partnerships. Sampson claims the damages were awarded without a showing by Richtron that at the time Sampson took control of the partnerships, their limited partnership interests were worth the original amounts contributed. In other words, Sampson claims the *evidence* does not support the trial court's findings. As we have stated repeatedly throughout this opinion, Sampson is precluded from raising this challenge because he has failed to marshall the evidence. *See, e.g., Harline v. Campbell,* 728 P.2d 980, 982 (Utah 1986). Accordingly, the trial court's award to Richtron Financial and Richtron, Inc. is affirmed.

### Richtron's Cross–Appeal

In its cross-appeal, Richtron claims the trial court erred in refusing to award as damages the full amount collected and disbursed by Sampson during the first twenty-eight months of his unauthorized control of the limited partnerships. Richtron also claims the trial court erred in declining to award damages to Richtron for all the loan advances it made to the limited partnerships. We reemphasize that Richtron is held to the same standards of review previously set forth in this opinion.

 As to Richtron's first claim, the trial court found that most of the funds that passed through Sampson's hands were paid out to satisfy partnership expenses.

As a result, the trial court held that to any extent the funds were used to pay legitimate partnership obligations, Sampson was entitled to a credit. Based on this finding, the trial court refused to award any of the $645,000 requested by Richtron. In the absence of a complete record, we assume the court's findings are supported by the evidence, *Cornish Town v. Koller,* 758 P.2d 919, 922 (Utah 1988), and the findings clearly support the trial court's refusal to award Richtron damages for the total amount collected and disbursed by Sampson.

 As to the second claim of error, the trial court refused to award Richtron its loan advances based on the following findings:

The evidence did not contain anything about loan instruments having been prepared when such advances were made or repayments being made out of gross receipts in accordance with the "terms of the loan instruments," it being noted here and I so find that the promissory notes which Richins prepared on or about June 5, 1980 and signed for the partnerships as president of the general partner, did not constitute "loan instruments" as that term was used in the partnership agreement.

In addition, the court found that the circumstances triggering repayment as required by certain other partnership agreements had not occurred.

Finally, the court observed:

[I]t is apparent that repayment of the advances to the general partners was conditional upon the end results of each partnership, which leaves no assurance that any partnership, if properly wound up, as provided by law and the partnership agreements, would have been able to repay any of the obligations owed by it to the general partner for such advances.

In sum, the trial court's findings do not support Richtron's claim that Sampson's intentional interference deprived Richtron of the money it had advanced to the limited partnerships, and accordingly, we affirm

the trial court's refusal to award such advances.

## Punitive Damages

 Richtron's final claim of error on cross-appeal is that the trial court erred in refusing to award Richtron punitive damages. In order to recover punitive damages, a plaintiff must prove the defendant's conduct was willful and malicious, or manifested a knowing and reckless indifference and disregard toward the rights of others. *See, e.g., Johnson v. Rogers,* 763 P.2d 771, 774 (Utah 1988). "Whether punitive damages [should be] awarded is generally a question of fact within the sound discretion of the [fact finder]," and will not be disturbed absent an abuse of discretion. *Biswell v. Duncan,* 742 P.2d 80, 86 (Utah Ct.App.1987).

Although there are sufficient findings to support the reckless disregard standard for the award of punitive damages, especially in light of Sampson's professional and fiduciary obligations as an attorney, we will not substitute our judgment for that of the trial court. The court heard the evidence, and had the opportunity to observe the witnesses. The trial court clearly considered the appropriate legal standards for imposing punitive damages, and concluded Sampson's conduct did not rise to the necessary level. Based on the foregoing, the trial court's refusal to award punitive damages was not an abuse of discretion, and accordingly, we affirm.

## CONCLUSION

In sum we hold that the trial court's findings of fact support its conclusion that Sampson interfered with Richtron's economic relations by improper means, causing Richtron pecuniary loss. We further find that the court's findings support its award of damages to all of the Richtron parties. Finally, we conclude the trial court's findings support its refusal to award additional compensatory damages to Richtron and its refusal to award punitive damages. Based on the foregoing, the trial court's judgment is affirmed.

ORME and JACKSON, JJ., concur.