STATE of Utah, Plaintiff and Appellee,

v.

James A. BYRNS, Jr., Defendant and Appellant.

No. 930345–CA.

Court of Appeals of Utah.

July 13, 1995.

## ORDER

Michael D. Esplin, Aldrich, Nelson, Weight & Esplin, Provo, for appellant.

Joanne C. Slotnik, Asst. Atty. Gen., Jan Graham, State Atty. Gen., Salt Lake City, for appellee.

## OPINION

Before Bench, Billings and Greenwood, JJ.

BILLINGS, Judge:

Upon entering a conditional plea of no contest to the charges of arranging to distribute methamphetamine and possession of a listed chemical with intent to manufacture, defendant James Arthur Byrns, Jr. appeals several of the district court's pretrial rulings. We affirm.

## FACTS

Defendant and Ross Argyle met while in custody in Oregon. Thereafter, defendant returned to his parent's home in Reno, Nevada, and Argyle was extradited to Utah. While in the Utah County Jail, Argyle told a Provo City police officer that defendant had previously travelled to Utah to obtain precursors used in manufacturing methamphetamine.

The police officer contacted the federal Drug Enforcement Agency, and a federal agent met with Argyle at the Provo City Police Department. With the agent present, Argyle telephoned defendant, and Argyle and defendant developed plans to manufacture methamphetamine in Utah County. Argyle agreed to wire defendant money for the bus fare to Wendover. In a subsequent telephone conversation with defendant, Argyle introduced the federal agent as his friend and financial backer. Thereafter, defendant spoke to the agent by telephone at least six times. Defendant specified the equipment and chemicals the agent was to procure, and the two solidified their plans to begin manufacturing methamphetamine. When the agent indicated that he wanted to learn how to manufacture the drug himself, defendant responded that he would teach him for $10,-000.

Subsequently, defendant took a bus to Wendover, where the agent met him and drove him to a mobile home in Lindon, Utah. The equipment defendant had requested was inside the mobile home, and defendant made a list of additional necessary items. Once the items were procured, defendant began pouring bottles of ephedrine tablets into gallon jugs of distilled water. Defendant was thereafter arrested by the Provo City S.W.A.T. team.

Defendant was indicted in the United States District Court on a single count of attempting to manufacture methamphetamine. A little more than one year later, the court dismissed the indictment with prejudice based on a violation of the Federal Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1985).

Two days after the federal court's dismissal, defendant was arrested and charged in state court with one count of arranging to distribute methamphetamine and two counts of possession of listed chemicals with intent to manufacture. The state charges were based on the same activity that gave rise to the federal charges.

Thereafter, defendant filed several motions, including a motion to dismiss on grounds of double jeopardy, a motion regarding an entrapment defense, and a motion to secure Argyle as a witness. A hearing was held December 10, 1992, at which counsel for the State and defendant agreed, with the court's approval, that the State would attempt to ensure Argyle's presence at a followup hearing scheduled for March 8, 1993. The court then heard the federal agent's and the Provo City police officer's testimony and took the entrapment issue under advisement pending Argyle's testimony.

At the March 8 hearing, the State reported that it had not been able to locate Argyle. Defendant interposed a motion to dismiss based on this failure. Thereafter, the State called two witnesses and proffered the testimony of two others.

On March 15, 1993, the court issued a written ruling denying defendant's motion to

dismiss, as well as his entrapment defense. Following a plea bargain, defendant entered a conditional plea of no contest. This appeal followed.

## I. DOUBLE JEOPARDY

Defendant argues the State's prosecution, brought after the federal district court dismissed his indictment, violates the guarantee against double jeopardy contained in the Fifth Amendment to the United States Constitution.

■ The Double Jeopardy Clause states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The United States Supreme Court has recognized two distinct protections embodied in this clause. In its primary sense, the clause protects criminal defendants from being subjected to successive prosecutions for the same criminal offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *United States v. Blackwell*, 900 F.2d 742, 745 (4th Cir.1990). A defendant is not placed in jeopardy until a jury is impaneled and sworn, or if a bench trial, the first witness is sworn. *Crist v. Bretz*, 437 U.S. 28, 37 & n. 15, 98 S.Ct. 2156, 2162 & n. 15, 57 L.Ed.2d 24 (1978); *United States v. Belcher*, 762 F.Supp. 666, 669 (W.D.Va.1991). Since defendant's case was dismissed prior to trial in the federal prosecution, he was never placed in jeopardy in the primary sense.

■ The secondary aspect of the Double Jeopardy Clause, collateral estoppel, protects criminal defendants from having to relitigate issues that have been resolved in their favor by a valid and final judgment. *Ashe v. Swenson*, 397 U.S. 436, 443–46, 90 S.Ct. 1189, 1194–95, 25 L.Ed.2d 469 (1970); *Blackwell*, 900 F.2d at 745. Under collateral estoppel principles, the pretrial disposition of a case in a prior prosecution may be sufficient to bar a subsequent prosecution. *Blackwell*, 900 F.2d

at 745; *Belcher*, 762 F.Supp. at 670. The Fourth Circuit Court of Appeals explained:

"[O]nce an issue of ultimate fact has been resolved in a defendant's favor by a valid and final judgment in a criminal proceeding, the government may not relitigate that issue in a subsequent criminal prosecution against him. If the fact necessarily determined in the first trial is an essential element of the second offense, collateral estoppel may operate as a complete bar against the subsequent prosecution, affording the defendant 'double jeopardy' protection, even when that prosecution is not for the 'same offense' as the first. In other instances, collateral estoppel may operate not wholly to preclude prosecution but simply to foreclose the relitigation of certain issues of fact that were necessarily resolved in the defendant's favor in the first trial."

*Blackwell*, 900 F.2d at 745 (quoting *United States v. Ragins*, 840 F.2d 1184, 1194 (4th Cir.1988) (citations omitted)).

In the present case, the only litigated issue was whether the federal prosecutor's post-indictment delay in bringing defendant to trial violated section 3162 of the Speedy Trial Act. The federal district court determined that it did and dismissed the case. Defendant now argues that that determination bars the State from further prosecution.

■ Under the "dual sovereignty" doctrine, principles of collateral estoppel generally cannot be invoked to bar the relitigation of an issue by a separate sovereign. *See United States v. Smith*, 446 F.2d 200, 202 (4th Cir.1971) (holding federal government not barred from relitigating facts resolved in defendant's favor in prior state prosecution because federal government is "neither the same as nor in privity" with state); *Belcher*, 762 F.Supp. at 670 (noting general rule that sovereign is not bound by collateral estoppel effect of prior proceeding of separate sovereign).[1] However, *Bartkus v. Illinois*, 359

---

1. The dual sovereignty principle retains its vitality in Utah. In *State v. Franklin*, 735 P.2d 34 (Utah 1987), the Utah Supreme Court expressly declined to abandon the doctrine. The court emphasized that if it did so, "the State of Utah would be foreclosed from legitimate prosecutions

by the errors, omissions, or inadequacies of federal prosecutions and would be unable to try even a defendant who had received a federal pardon or whose conviction was reversed by a federal appellate court because of an error in the federal trial." *Id.* at 38.

U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), carved out a narrow exception to that rule. *Bartkus* "bars a second prosecution where one prosecuting sovereign can be said to be acting as a 'tool' of the other ..., or where the second prosecution amounts to a 'sham and a cover' for the first." *Belcher,* 762 F.Supp. at 670 (quoting *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir. 1984)).

■ The United States District Court elucidated the *Bartkus* exception in *Belcher. Belcher* involved a federal prosecution brought on the heels of a state dismissal. The same person acted both as attorney for the Commonwealth of Virginia and Special Assistant United States Attorney for the Western District of Virginia, prosecuting the defendants first for the commonwealth, and when that case was dismissed, for the United States. On appeal, the court stated that the *Bartkus* exception is "best understood and applied in a situation where the principles of federalism are blurred and 'the power of centralized government' works to deprive a citizen of fundamental rights." *Id.* The court emphasized, "State governments have their own decision makers who arrive at independent judgments as to the use of the awesome power they possess over who, when and how to prosecute. The court believes that federalism does not contemplate the uniting of these awesome powers in one person." *Id.* at 671 (citing *United States v. Wheeler,* 435 U.S. 313, 320, 98 S.Ct. 1079, 1084, 55 L.Ed.2d 303 (1978)). Therefore, the court concluded, collateral estoppel barred the federal government from prosecuting because a determinative issue had been decided in the defendants' favor in the state prosecution. *Id.*

Defendant argues that the *Bartkus* exception applies in the present case because state and federal law enforcement agents worked together throughout the investigation. However, in *United States v. Aboumoussallem,* 726 F.2d 906 (2d Cir.1984), the United States Court of Appeals rejected this precise argument, reaffirming that "a joint investigation of criminal activity ... does not preclude separate prosecutions." *Id.* at 910; *accord United States v. Bernhardt,* 831 F.2d 181, 182 (9th Cir.1987) ("It is clear that the *Bart-*

*kus* exception does not bar cooperation between prosecuting sovereignties."). Moreover, the record reveals nothing akin to the collusion between federal and state authorities, or the blurring of federalism, that was present in *Belcher.* We therefore reject defendant's double jeopardy argument.

## II. PROSECUTORIAL DELAY

Next, defendant argues that his Sixth Amendment right to a speedy trial and his right to due process were violated by the State's delay in filing charges until the federal case was dismissed.

■ The Sixth Amendment and the Due Process Clause involve two distinct aspects of prosecutorial delay. Delay between formal accusation and trial implicates the Sixth Amendment, *see United States v. Lovasco,* 431 U.S. 783, 788–89, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971), while delay between the commission of an offense and initiation of prosecution raises due process concerns, *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048; *Marion,* 404 U.S. at 324, 92 S.Ct. at 465.

■ In the present case, defendant expressly waived his Sixth Amendment right to a speedy trial commencing after the State's arrest so that certain preliminary matters could be resolved. Thus, defendant's Sixth Amendment argument is premised on the federal arrest being chargeable to the State. However, the federal arrest is only chargeable to the State if the state and federal governments were acting together as a single sovereign, which, as noted above, is a proposition the evidence does not support.

Defendant also argues that his due process rights have been violated. In *Lovasco,* the Supreme Court addressed whether preaccusation delay might raise due process concerns. 431 U.S. at 795–96, 97 S.Ct. at 2051–52. The Court indicated that if the delay resulted in prejudice to the defendant and was undertaken for an impermissible reason, such as to gain tactical advantage over the accused, due process might be violated. *Id.* However, the Court emphasized that investigative delay, as opposed to tactical delay,

does not deprive a defendant of due process, "even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796, 97 S.Ct. at 2051–52.

In *United States v. Revada,* 574 F.2d 1047 (10th Cir.1978), the Tenth Circuit Court of Appeals, applying *Lovasco,* articulated a two-pronged test to measure the due process implications of pre-indictment delay. This test, which the Utah Supreme Court approved in *State v. Smith,* 699 P.2d 711, 714 (Utah 1985), provides:

> "[T]he rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harass the defendants."

*Revada,* 574 F.2d at 1048 (quoting *United States v. Beitscher,* 467 F.2d 269, 272 (10th Cir.1972)).

██ Defendant argues that he was prejudiced and the State gained a tactical advantage because Argyle could not be located by the time the State initiated its prosecution against him. However, whatever tactical advantage the State may have gained, it clearly cannot be said that the State delayed *for that purpose.* The State delayed because defendant was incarcerated and was awaiting trial on federal charges and could not have simultaneously stood trial on state charges. Thus, the "purposeful design" element of the *Revada* test is not met. *Cf. People v. Gates,* 43 Cal.3d 1168, 240 Cal.Rptr. 666, 743 P.2d 301, 317 (1987) (holding pendency of another trial constitutes good cause for delay and thus finding defendant's statutory and constitutional speedy trial claims without merit).

### III. FAILURE TO PRODUCE MATERIAL WITNESS

Next, defendant argues the trial court erred in denying his motion to dismiss because of the State's failure to produce Argyle as a witness at his March 8, 1993 entrapment hearing.

Prior to the December 10, 1992 hearing, defendant filed a motion to secure attendance of an out-of-state witness, namely, Argyle.

The court heard the State's response to this motion at the hearing. Counsel for the State indicated that "in this case we are as interested in hearing from Mr. Argyle as they are." Moreover, the State offered to "subpoena him as a State's witness and have him here" if the defense would provide information about where he was. Defense counsel responded that he had no objection to the State's suggestion and that he thought he had enough information to enable the State to locate Argyle.

The court addressed defense counsel on the issue of Argyle's testimony, asking:

> What is your intent with him? If you could proffer as it relates to your position today, what would you state? That doesn't bar you or stop you from calling him and presenting additional information.
>
> But what critical factors or what substance are involved that would have bearing upon the Court's determination on the initial—on this motion?

Defense counsel responded:

> Well, I've heard things in the past from the State's position that Mr. Argyle was not an agent of the State in any way. Testimony today I think obliges that position.
>
> I think it's clear that at the time that he called—at least when he made those later conversations—he was clearly working in concert with the officers. But there were previous conversations.
>
> I would be proffering that Mr. Argyle would indicate that he had other conversations with Mr. Byrns that occurred prior to the taped conversations, which the officers—or which the State has—
>
> THE COURT: He was not an agent at that time, correct?
>
> [COUNSEL FOR THE STATE]: That's the position of the State.
>
> [DEFENSE COUNSEL]: Well, our position is: That's the question. We think there's a question about that, because we think at that time when he had originally made some additional contacts with the defendant, he was already aware of some interest in the defendant by the—at least the local law enforcement people and was

trying to set up something where he had something to offer further. And that's the reason we need him.

The court then agreed to hear the evidence the parties were prepared to present and to delay ruling until March 8, 1993, when it could hear Argyle's testimony.

At the March 8 hearing, the State had not been able to locate Argyle and thus did not produce him. Defendant interposed an oral motion to dismiss due to this failure. The trial court took the matter under advisement and, on March 15, filed a written ruling denying defendant's motion on the basis that Argyle was not a material witness. In support of its conclusion, the court made the following findings of fact from the evidence presented at the December 10 hearing:

> (1) [that] Ross Argyle acted as a confidential informant during the investigation; (2) that Argyle became an informant after his extradition to Utah on probation violation charges; (3) that Argyle was provided remuneration for information; [and] (4) [that] all conversations between Argyle and defendant made while Argyle was in Provo were tape recorded.

Additionally, the court noted: "There was no evidence presented to the Court that Argyle was an agent for the DEA or other law enforcement agency prior to his extradition to Utah."

Defendant claims that this ruling was an abuse of discretion. He argues that the parties at the December 10 hearing presumed that Argyle was a material witness and did not present evidence on that issue, and that the court's ruling was therefore an improper "after-the-fact determination."

■ Defendant's argument mistakes with whom the burden of demonstrating materiality lies. "[A] criminal defendant, in order to establish a violation of his constitutional right to compulsory process, must make some plausible showing that the testimony of the absent witness 'would have been both material and favorable to his defense.'" *State v. Schreuder*, 712 P.2d 264, 274 (Utah 1985) (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982) (footnote omitted)).

Testimony is material "if there is a reasonable probability that its presence would affect the outcome of the trial." *Id.* at 275.

■ Although materiality was not an issue at the December 10 hearing, it clearly became an issue when defendant moved to dismiss at the March 8 hearing. It was therefore defendant's responsibility to present evidence of materiality at that time. *See id.* at 274. Defendant failed to do so. Thus the only record evidence concerning the issue of Argyle's materiality is the above-quoted exchange between the trial court and defense counsel, which took place at the December 10 hearing. We therefore address whether that evidence is sufficient to support the trial court's finding.

The December 10 exchange between the trial court and defense counsel reveals that defense counsel was not able to make a plausible showing that Argyle's testimony would be favorable to the defense, but rather could only speculate as to how he thought Argyle might testify. *Cf. State v. Lairby*, 699 P.2d 1187, 1195 (Utah 1984) (holding that where no description of witness's evidence offered, and no suggestion made as to how testimony would affect defendant's case, trial court did not err in refusing to issue certificate ordering witness's attendance). Moreover, as delineated *infra* in our analysis of defendant's entrapment defense, even if Argyle were to testify as defendant's counsel speculated, it is not reasonably probable that his testimony would have affected the outcome of the entrapment hearing. We therefore affirm the trial court's denial of defendant's motion to dismiss.

## IV. ENTRAPMENT

■ Defendant's final argument is that the trial court erred in denying his entrapment defense. The State responds that defendant failed to include in the record a transcript of all evidence relevant to the court's findings and conclusions on entrapment, which he was required to do by Rule 11(e)(2) of the Utah Rules of Appellate Procedure.

Rule 11(e)(2) provides:

If the appellant intends to urge on appeal that a finding or conclusion is unsupported by or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion.

Utah R.App.P. 11(e)(2). In *Sampson v. Richins,* 770 P.2d 998 (Utah App.1989), this court held that Rule 11(e)(2) "directs counsel to provide this court with *all evidence* relevant to the issues raised on appeal." *Id.* at 1002. When the appellant does not do so, we "presume the trial court's findings are supported by competent and sufficient evidence." *Id.; see also Call v. City of West Jordan,* 788 P.2d 1049, 1053 (Utah 1990); *State v. Linden,* 761 P.2d 1386, 1388 (Utah 1988).

In this case, defendant failed to provide this court with a transcript of the March 8 entrapment hearing, which it was his responsibility to do. *See* Utah R.App.P. 11(e)(2). "Therefore, our review is strictly limited to whether the trial court's findings of fact support its conclusions of law and judgment." *Sampson,* 770 P.2d at 1002; *accord State v. Garza,* 820 P.2d 937, 938–39 (Utah App.1991) (holding court cannot consider proceedings below without adequate record).

█ Section 76–2–303 of the Utah Code sets forth the entrapment defense. That section provides:

(1) It is a defense that the actor was entrapped into committing the offense. Entrapment occurs when a law enforcement officer or a person directed by or acting in cooperation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

Utah Code Ann. § 76–2–303 (1995). Thus, in determining whether entrapment has occurred, the test is whether the conduct of law enforcement officers or their undercover partners created a substantial risk that the offense would be committed by one not otherwise ready to commit it.

█ The test is an objective one. *State v. Taylor,* 599 P.2d 496, 499–500 (Utah 1979). "Under the objective view of entrapment, the focus is not on the propensities and predisposition of the specific defendant, but on whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Id.* at 500; *see also State v. Cripps,* 692 P.2d 747, 749 (Utah 1984); *State v. Wright,* 744 P.2d 315, 317–18 (Utah App.1987). Defendant argues the police conduct in this case fell below the objective standard set forth in *Taylor.*

█ In its detailed, written ruling, the trial court determined: "[I]n the present case there is nothing in the recorded transcripts o[r] conversations between the defendant and Argyle that demonstrates an 'inducement' offered by Argyle to defendant," and "the law enforcement conduct did not create a substantial risk that the offense would be committed by one not otherwise ready to commit it." In support of this determination, the trial court stated:

The facts supporting this determination are numerous. The transcript of the telephone conversations between August 2, and August 7 are replete with statements by defendant demonstrating his willingness and eagerness to set up a methamphetamine lab.... The defendant also fully understood the risk he was taking. Rather than arm twist the defendant into coming to Utah, the officers involved merely provided the defendant with an opportunity to set up the lab. The statements in the transcript and the testimony of the officers are consistent. The defendant planned on coming to Utah, setting up a Meth lab, selling the product, and dividing the proceeds between himself, Ross Argyle, and an undercover DEA agent, Charles Illsley. The defendant specifically requested money from agent Illsley and the Court specifically finds that the defendant's request for "tuition" did not induce defendant to come to Utah and set up the lab. The ten thousand dollars was the amount agent Illsley agreed to pay defen-

dant for learning how to produce methamphetamine.

(Footnote omitted.)

The trial court's findings clearly support its determination that the law enforcement conduct in this case was not substandard. We therefore affirm the trial court's entrapment ruling.

## CONCLUSION

We conclude the State did not violate the Fifth Amendment guarantee against double jeopardy by bringing its prosecution on the heels of the federal government's dismissal of its case against defendant. Nor did the State's waiting until that time violate defendant's rights to a speedy trial or his right to due process. Furthermore, the trial court's denial of defendant's motion to dismiss for failure to produce a material witness was not an abuse of discretion. Finally, the trial court did not err in denying defendant's entrapment defense. We therefore affirm the trial court's ruling.

BENCH and GREENWOOD, JJ., concur.