# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 21, 2011 Session

## MICHELLE BROWN v. BROOKDALE SENIOR LIVING, INC., ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 091081IV     Russell T. Perkins, Chancellor

### No. M2011-00540-COA-R3-CV - Filed December 28, 2011

Plaintiff appeals the trial court's grant of summary judgment to defendants on her claims for statutory procurement of breach of contract, common law inducement of breach of contract, and tortious interference with business relationship. Finding that plaintiff failed to establish one or more essential element of each claim, we affirm the trial court's ruling.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. S., M. S., and ANDY D. BENNETT, J., joined.

Lorraine Wade, Nashville, Tennessee, for the Appellant, Michelle Brown.

Luther Wright, Jr. and Wendy V. Miller, Nashville, Tennessee, for the Appellee, Brookdale Senior Living, Inc. d/b/a The Cumberland at Green Hills, Katherine Diehl, and Becky Hendricks.

## OPINION

BACKGROUND

The Cumberland at Green Hills ("Cumberland") is an assisted living facility owned and operated by Brookdale Senior Living, Inc. ("Brookdale"). The Cumberland rents apartments to elderly individuals and permits its residents to enter into independent contracts with third parties for their care.

On June 2, 2009, Michelle Brown filed a complaint against Brookdale, and the Cumberland's Wellness Director, Katherine Diehl, and Executive Director, Becky Hendricks. Ms. Brown alleged that she had entered into a "caregiver services contract" with Gerald Johnson, a resident of the Cumberland who suffered from Alzheimer's disease, and began

acting as a "sitter" for him sometime in March 2009. The complaint alleged that on or about April 13 Ms. Diehl and Ms. Hendricks told Ms. Brown that she could no longer provide services for Mr. Johnson, forced her out of the building, and sent correspondence to Mr. Johnson's attorney-in-fact that led to termination of the contract between Mr. Johnson and Ms. Brown. The complaint asserted claims for unlawful procurement of breach of contract in violation of Tenn. Code Ann. § 47-50-109, common law inducement of breach of contract, intentional interference with a business relationship, and civil conspiracy; the complaint sought compensatory, treble, and punitive damages. The actions of Ms. Diehl and Ms. Hendricks were imputed to Brookdale under the doctrine of *respondeat superior*.

Defendants answered the complaint and, on October 15, 2010, filed a motion for summary judgment, supported by a statement of undisputed facts and sixteen exhibits, including, *inter alia*, the depositions of Ms. Brown and Ms. Charlene Wilson, excerpts from the depositions of Ms. Diehl and Ms. Hendricks, and various of the parties' discovery responses. On December 13, Ms. Brown filed a response to defendants' memorandum of law, a response to the statement of undisputed facts, and her own statement of undisputed facts. Ms. Brown subsequently filed an amended memorandum and an amended statement of undisputed facts, as to which defendants responded.

A hearing was held on the motion for summary judgment and, on February 9, 2011, the court entered an order dismissing the case. The court found that summary judgment was proper on the civil conspiracy claim "given the intracorporate merging of identities of Defendants and Plaintiff's admission that the individual defendants were acting within the scope of their respective employments with Brookdale at all relevant times." The court granted summary judgment on the claims for procurement or inducement of breach of contract because Ms. Brown did not prove two elements of the claims: (1) that there was a legal contract and (2) that there was a breach of contract.[1] The court held that summary judgment was appropriate on the claim for intentional interference with business relationships because Ms. Brown was unable to show that defendants acted with improper means or improper motive, or that she had suffered damages.[2]

_____

[1] The court found that there was no legal contract between Ms. Brown and Mr. Johnson because the document produced by Ms. Brown "[did] not mention Mr. Johnson or specify to whom Ms. Brown would be providing caregiver services;" the court further found that Mr. Johnson's daughter, Lisa Manning, signed the contract by writing "Charlene Wilson" in the signature block. Ms. Wilson is Mr. Johnson's sister-in-law, and the court found that "there was no indication that [Ms. Manning] was signing for Mr. Johnson or that she was authorized to sign on Ms. Wilson's behalf." With regard to breach, the court found that "Plaintiff admitted that the contract she had with Mr. Johnson, or his family, was never breached."

[2] The court stated that Brookdale received a copy of Ms. Brown's criminal history—which included convictions for identity theft—two days after defendants had asked Ms. Brown to leave the Cumberland. Based on defendants' testimony, the court concluded that Brookdale "would have asked Plaintiff to leave

-2-

Ms. Brown appeals, asserting that the trial court improperly granted the motion for summary judgment. She contends that, with respect to her claims for procurement or inducement of breach of contract, the trial court erred when it found there was not a legal contract between Ms. Brown and Mr. Johnson; she also contends that the court erred in its finding that Ms. Brown could not prove that defendants had an improper means or motive or prove damages on her intentional interference with a business relationship claim.[3]

STANDARD OF REVIEW[4]

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Draper v. Westerfield*, 181 S.W.3d 283, 288 (Tenn. 2005); *BellSouth Adver. & Publ. Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 284 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). We review the summary judgment decision *de novo* as a question of law. *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004); *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000). In our review, we consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we afford that party all reasonable inferences. *Draper*, 181 S.W.3d at 288; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993).

---

[its] premises on the date it received the Criminal Records Fax had she still been providing services" and that "excluding individuals with multiple convictions for identity theft from providing services in an assisted living facility is reasonable and is not an indication of malice." As to damages, the court held that Ms. Brown received payment through the end of April 2009 "and, therefore, has been compensated for the time that she provided services and for approximately two weeks . . . that she did not provide services."

[3] Ms. Brown does not appeal the grant of summary judgment on the civil conspiracy claim.

[4] In Chapter 498, Public Acts of 2011, the Tennessee General Assembly amended Title 20 of the Tennessee Code to add, as a new chapter, Tenn. Code Ann. § 20-16-101. According to Chapter 498, the purpose of the amendment was to overrule the standard for courts considering summary judgment motions filed by parties who do not bear the burden of proof at trial as set forth in *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008); the statute applies to actions filed on or after July 1, 2011. Because this lawsuit was filed in 2009, we review the trial court's decision under the summary judgment standard in effect at that time.

DISCUSSION

*A. Inducement or procurement of breach of contract*

Ms. Brown asserted claims against defendants for the common law tort of inducement of breach of her contract and unlawful procurement of breach of contract in violation of Tenn. Code Ann. § 47-50-109, which is the statutory embodiment of the common law tort. *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989) (citing *Emmco Ins. Co. v. Beacon Mutual Indemnity Co.*, 322 S.W.2d 226, 231 (Tenn. 1959)). In order to prevail on such claims, a plaintiff must prove that there was a legal contract of which the wrongdoer was aware, that the wrongdoer maliciously intended to procure or induce a breach, and that as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 822 (Tenn. 1994) (citing *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989)). While punitive damages are available to a successful plaintiff in a common law tort action, Tenn. Code Ann. § 47-50-109 provides for an award of treble damages.

The instrument upon which Ms. Brown bases her contract claims is a document she variously refers to as an "independent contractor's agreement" or a "caregiver service contract" (the "Agreement").[5] This instrument, however, does not satisfy the elements of a

---

[5] The Agreement is as follows:

Michelle's Caregiver Service & More

This is a contract between the client and provider. The following Services will be provided to our clients. The Services includes: assisting of medications, light house duties, doctor's appointment, rehabilitation, assisting with bathes and etc. For a Rate of $12.00 per hour, for 24 hours around the clock care. This Contract will continue through March 23, 2010. If you are satisfied with our Services that we provide, we will continue Services and Renew Contract as followed.

The Client shall make payment on Mondays for the week of Services starting Monday, March 23, 2009 and on Mondays here after an Invoice will be sent to Client a week in advance.

These are the important jobs that we will be consistence at all times with. For any reason that the client is unsatisfied with Services and you want to cancel Contract, Please give us a 48 hour notice.

Thank you so much for your time and consideration! Any questions and concerns Please feel free to call Michelle Brown (615) 569-1647.

contract and cannot form the basis of an action under Tenn. Code Ann. § 47-50-109 or for inducement of breach of contract.

A contract is a result of a meeting of the minds of the parties who mutually assent to its terms, is based upon a sufficient consideration, is free from fraud or undue influence, not against public policy, and is sufficiently definite to be enforced. *Johnson v. Cent. Nat. Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962). The Agreement does not identify the parties to the Agreement, does not name the recipient of the services, and the only signature on the Agreement purports to be the signature of a "Charlene Wilson." Ms. Wilson, Mr. Johnson's sister-in-law, however, testified in her deposition that she did not sign the Agreement, did not recognize the signature, and was not the attorney-in-fact for Mr. Johnson. Ms. Brown admitted in response to defendants' statement of undisputed facts that Lisa Manning, Mr. Johnson's daughter, signed Ms. Wilson's name on the Agreement.[6] The Agreement and the evidence of record do not show a meeting of the minds of Ms. Brown and any other individual relative to the Agreement, or that the services recited in the Agreement were to be rendered for Mr. Johnson. The trial court correctly held that it was not a legal contract.

We also note that, in Ms. Brown's responses to defendants' first set of interrogatories, which were filed as an exhibit to defendants' motion for summary judgment, Ms. Brown admitted the following:

19. Do you contend that Mr. Johnson breached the "independent contractor's agreement" referred to in your Complaint? If so, set forth the date on which Mr. Johnson allegedly breached such contract, set forth the factual basis supporting your contention that such contract was breached by Mr. Johnson and identify any and all documents supporting your contention that Mr. Johnson breached such contract.

> RESPONSE: I do not think that Mr. Johnson breached anything, it was the Defendants that interfered with the contract.

20. Do you contend that Mr. Johnson terminated the "independent contractor's agreement" referred to in your Complaint? If so, set forth the date on which

---

Sign/Date 3/23/09          Sign/Date Charlene Wilson
Service Provider                 Client

[6] Ms. Brown contends that Mr. Johnson had appointed Ms. Manning as his attorney-in-fact. Ms. Manning did not file an affidavit or testify in this matter, and a power of attorney for Mr. Johnson is not in the record.

Mr. Johnson terminated such contract, identify any and all witnesses to Mr. Johnson terminating such contract and identify any and all documents supporting your contention that Mr. Johnson terminated such contract.

> RESPONSE: No, Mr. Johnson did not terminate the contract;
> the Defendants interfered with the contract.

Because breach or termination is an essential element of her statutory and common law claims for procurement or inducement of breach of contract, Ms. Brown's admission that the Agreement was not breached or terminated by Mr. Johnson was fatal.

Accordingly, the trial court did not err in granting summary judgment to defendants on the statutory and common law claims for procurement or inducement of breach of contract.

*B. Intentional Interference with Business Relationship*

Ms. Brown contends that defendants interfered with her business relationship with Mr. Johnson when they "forced" her from the Cumberland. Ms. Brown asserts that the trial court erred in finding that she could not prove that defendants had an improper motive or means and when it held that she could not prove damages. Defendants assert that Ms. Brown was asked to leave the Cumberland because she did not have insurance and because she had yelled at a resident.

The tort of intentional interference with a business relationship was expressly recognized in Tennessee in *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). The court stated:

> [L]iability should be imposed on the interfering party provided that the plaintiff can demonstrate the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc.*, 71 S.W.3d at 701 (internal citations removed). Whether a defendant acted improperly or possessed an improper motive is "dependent on the particular facts and circumstances of a given case," and as a result there is no precise, all-encompassing definition of the term improper. Examples of improper means include

those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* To prove improper motive, the plaintiff must "demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* at note 5; *see Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307–08 (Utah 1982).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8–9 (Tenn. 2008).

In support of their motion for summary judgment, defendants filed, *inter alia*, Defendants' Statement of Undisputed Facts and the depositions of Ms. Brown, Ms. Hendricks, and Kendall Whitsey, who was an employee of the Cumberland. Ms. Hendricks testified that, in accordance with the Cumberland's policy, Ms. Brown was required to have liability insurance because she was "employing staff and scheduling staff around the clock."[7] Ms. Hendricks testified that when she learned that Ms. Brown was "staffing" sitters and "acting as her own agency," she gave Ms. Brown a document, which she called a third party agreement, in which the insurance requirement was set forth, asked Ms. Brown to review it, and told Ms. Brown to provide proof of liability insurance in order to continue providing services at the Cumberland.[8]

Plaintiff's Responses to Defendants' Statement of Undisputed Facts establishes that, on April 4, 2009, Ms. Brown submitted an insurance application and check to Imperial

---

[7] In her response to the statement of undisputed facts, Ms. Brown admitted that she was working as a contractor for an agency called Seniors & More, Inc. when she first began sitting with Mr. Johnson; after working with Seniors for approximately two weeks, Ms. Brown ended her relationship with Seniors and formed her own company, "Michelle's Caregiver Service and More"; and that on or about March 23, 2009 she began providing services to Mr. Johnson through Michelle's and that she paid two individuals $8.50 per hour to work two shifts so that Mr. Johnson would have a sitter 24 hours a day.

[8] Ms. Hendricks testified that sitters who do not employ other individuals were not subject to the insurance requirement.

Insurance Agency. Initially, Imperial provided a certificate to Brookdale to show that Ms. Brown had the required liability insurance. However, on April 15, Imperial sent a fax to the Cumberland indicating that Ms. Brown did not have insurance coverage. Imperial's records reflect that Ms. Brown's insurance coverage was canceled because Ms. Brown failed to pay her insurance premium. Imperial's records further reflect that the check written by Ms. Brown to Imperial on April 4, 2009 was written from a closed account.

Ms. Whitsey testified that on one occasion she observed Ms. Brown yelling at Mr. Johnson and his wife in the hallway of the Cumberland, and that she reported the incident to Ms. Diehl. Ms. Hendricks further testified that on the same day she learned that Ms. Brown did not have insurance, and in light of the report that Ms. Brown had yelled at residents, she asked her to leave the Cumberland.

The materials filed by defendants support their assertion that Ms. Brown was asked to leave because she did not have liability insurance and because she had been observed yelling at a resident. The defendants' stated motives in asking Ms. Brown to leave the Cumberland were not improper as that term has been defined in claims of tortious interference with business relationships. *See Trau-Med of America, Inc.*, 71 S.W.3d at 701. The materials filed by defendants affirmatively negated an essential element of Ms. Brown's claim.

Once the moving party affirmatively negates an essential element, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id.* at 5 (citing *Byrd*, 847 S.W.2d at 215). Accordingly, Ms. Brown was required to demonstrate a genuine issue of material fact as to whether defendants' motive or means were improper.[9]

In her response to the motion, Ms. Brown asserted that she was "fired" because "she talked too much and was not nice to people outside, even though she did wonderful work" and because "of her race and the fact that [she] called the corporate office on Ms. Hendricks

---

[9] On a motion for summary judgment, the non-moving party may show a genuine issue of material fact by:

> (1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. Rule 56.06.

*Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

and Ms. Diehl."[10] In support of these contentions, she cited a portion of the deposition of Ms. Wilson and a letter attached to an affidavit filed by Quintella Winn, who worked as a sitter for another resident at the Cumberland.

The portion of Ms. Wilson's deposition cited by Ms. Brown states:

Q. So you said that one of [Mr. Johnson's daughters] told you that Kathy [Diehl] or Becky [Hendricks] let her go?
A. Yeah. But they told me why.
Q. And what did they tell you why? What did they tell you?
A. She talks too much.

The letter attached to Ms. Winn's affidavit states in its original form:[11]

To whom this may concern,

I am writing this statment on behalf of Michelle Brown,

I am a private duty caregiver and have been with the same client for 6 yeras, one of those years has been spent at the cumberland at 15 Burton Hill Court. I am well aware of the procedures when entering a facility but working private. I was asked on the entering of my client who moved in November 2007, to fill out a sitters guideline for a background check and to have a drug test taken as well. The comment from the adminstrator was in reference to the drug screen was 'if we could pass it.' This was the remark that was stated to me and another African American at that time. This is one of many slur remarks that have been stated to other cargivers of color. Their was know mention of a liability insurance coverage needed in order to work for my client according to the sitters guideline this is optional and left up to the hiring family. Ms. Brown approached me a couple of weeks ago with this concern. i explained to her the protocol and she proceeded to comply to do what she was asked to do by Becky Hendricks. After she purchased her insurance their were repeated harrassing things said and done to Ms. brown by those in authority. Like the

_____

[10] As an initial matter, we note that there is nothing in the record to show that Ms. Brown was "fired" by the defendants. We will consider this language in the context of the claim that the defendants interfered with her employment with Mr. Johnson.

[11] Neither the letter nor the affidavit identify the purpose of the letter, to whom the letter was sent, or if it was sent; the letter is not signed or dated. In our analysis, we consider the letter as if it were incorporated into the affidavit of Ms. Winn.

director of nursing ms. Catherine Dill who for no known reason was attempting a bias discharge on Ms. Brown, this took place and Ms. Brown was left with no other choice than to call the corperate office to file a complaint. This led to retaliation on Ms. Brown and to an escort off the premisis. I my self am now facing retaliation. The care of the cleints Ms. Brown was attending to immediately left them in unsafe conditions.

In order to survive a motion for summary judgment, the response must set forth specific facts creating a genuine issue for resolution by the trier of fact; the facts relied upon must be admissible at trial. *Byrd*, 847 S.W.2d at 215–16. Because the goal of summary judgment is to prevent unnecessary trials, permitting an opposition to a motion based on inadmissible evidence would undermine the goal of the summary judgment process. *Id.* at 216. Further, Tenn. R. Civ. P. 56.06 states, in pertinent part:

> Supporting and opposing affidavits *shall be made on personal knowledge, such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein*. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. . . .

(emphasis added).

In her deposition, Ms. Wilson testified what she was told by the daughters of Mr. Johnson which, in turn, was what the daughters were purportedly told by Ms. Diehl and Ms. Hendricks. Ms. Brown relied on the testimony to support her theory as to the improper motive of defendants in asking Ms. Brown to leave the premises. The cited testimony constituted hearsay, which is generally inadmissible in the absence of an exception. Tenn. R. Evid. 801(c), 802. There were no facts set forth in the response which would render the testimony admissible. Accordingly, the testimony could not be relied upon to establish any facts which would create a genuine issue of fact for trial. *Byrd*, 847 S.W.2d at 215–16.[12]

With regard to Ms. Winn's letter, Tenn. R. Civ. P. 56.06 limits the extent to which we may consider the allegations contained therein. First, the letter contains a substantial amount of hearsay. Ms. Winn's recitation of statements made by an unnamed administrator,

---

[12] Even if the cited testimony did not constitute hearsay, it does not establish any specific facts with respect to the defendants; it only states that one or more of Mr. Johnson's daughters told Ms. Wilson, in general terms, that Ms. Brown no longer worked at the Cumberland. It is not possible to discern from the cited testimony a motive or means of defendants that could be considered improper.

statements made by Ms. Brown to Ms. Winn, and any purportedly harassing statements made by "those in authority" to Ms. Brown constitute hearsay and would be inadmissible at trial. Tenn. R. Evid. 801(c). Accordingly, we do not consider them in our analysis. Tenn R. Evid. 802; *Byrd*, 847 S.W.2d at 215–16.

There is also a significant issue of Ms. Winn's personal knowledge relative to certain matters contained in the letter, as required by Tenn. R. Evid. 602. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. *Id.* Ms. Winn's position as a sitter for a resident—but not an employee of Cumberland—does not, without more, establish the personal knowledge necessary to testify relative to the Cumberland's policies and procedures and the application of those policies and procedures to persons other than herself. Further, the letter does not set forth the specific facts upon which Ms. Winn bases her conclusions that Ms. Brown "compl[ied]" with what Ms. Brown had been asked to do by Ms. Hendricks and that there was "bias" or "retaliation" against Ms. Brown, and, again, no facts to show that she has personal knowledge of these matters. Accordingly, these statements were not admissible and cannot be relied upon by Ms. Brown to establish genuine issues of fact for trial.

As further evidence of defendants' alleged improper means or motive, Ms. Brown relies on the statements in Ms. Winn's letter that Ms. Winn was a "private duty caregiver," and that liability insurance was "optional." The statements in the letter, however, do not raise a genuine issue of material fact as to whether the defendants' motive or means were improper; rather, they corroborate to a degree the reasons given by defendant for asking Ms. Brown to leave. Ms. Hendricks testified that "private duty sitters" are not subject to the insurance requirement, whereas "service providers" like Ms. Brown, who staffed and scheduled two additional individuals to provide services for Mr. Johnson 24 hours a day, were required to maintain liability insurance.[13] The record shows that the circumstances of their employment were not the same, and the fact that Ms. Winn was not required to have insurance does not create an issue of fact as to whether defendants' requirement that Ms. Brown maintain liability insurance was improper.

Ms. Brown did not meet her burden in responding to the motion for summary judgment; specifically, she failed to create a genuine issue of material fact as to whether the means or motives of the defendants for asking her to leave the premises was improper. As a consequence, her contention that the court erred when it held she could not prove damages is moot.

---

[13] In her brief, Ms. Brown contends that she was considered to be a "private duty employee" by the defendants rather than a service provider, and cites to the deposition of Ms. Hendricks in support of this contention. In the cited excerpt, Ms. Hendricks acknowledges that Ms. Brown was private duty sitter prior to March 23, 2009, when she began hiring persons to staff the care for Mr. Johnson.

CONCLUSION

For the foregoing reasons, the judgment of the Chancery Court for Davidson County is affirmed.

_____
RICHARD H. DINKINS, JUDGE